**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, a Delaware corporation; KONINKLIJKE PHILIPS ELECTRONICS NV, a foreign corporation; and PHILIPS MEDICAL SYSTEMS (CLEVELAND), INC., a California corporation, | **REPORT AND RECOMMENDATION** |
| | **Case No. 2:08-CV-639-CW-SA** |
|      Plaintiffs and Counter Defendants, | |
| v. | **District Judge Clark Waddoups** |
| BC TECHNICAL, | **Magistrate Judge Samuel Alba** |
|      Defendants and Counter Claimants. | |

     This case involves large amounts of electronic information. Under the federal rules, in addition to this court's discovery orders, the litigants and counsel were expected to take the necessary steps to ensure that relevant records were preserved when litigation was reasonably anticipated or began, and that those records were collected, reviewed, and produced to the opposing party during the discovery process. Unfortunately, as discussed herein, the court has concluded that Defendant and Counter Claimant BC Technical (hereafter "BCT") did not fulfill its discovery obligations or comply with this court's orders with respect to five of its laptop computers. BCT's behavior has resulted in great expense from the efforts made to uncover and retrieve the information that was deleted or destroyed. Further, the court must now determine

how to address a situation where - in violation of this court's direct orders and the Federal Rules of Civil Procedure - thousands of computer files were deliberately deleted and destroyed.

Before the court are the following motions: (1) Plaintiffs' Motion for Spoliation Sanctions (Doc. 135); (2) Plaintiffs' Motion for Order Holding Defendant In Contempt of Court Pursuant to Fed. R. Civ. P. 37(b) (Doc. 136); and (3) Plaintiffs' Second Motion for Spoliation Sanctions and for Order Holding Defendant in Contempt of Court (Doc. 174). Having reviewed these motions as well as all the pleadings in this matter, having conducted an evidentiary hearing, and having heard oral arguments, the court submits this Report and Recommendation.

## BACKGROUND

In January 2005, Philips sent BCT's then-President, Mr. Chuck Hale, a letter, dated January 20, 2005, alleging that BCT was improperly and illegally distributing software, was providing misleading information at a trade show booth, was publishing misleading literature, was making libelous and disparaging remarks on its website regarding Philips, and was systematically and deliberately attempting to damage Philips by targeting key Philips employees for employment with BCT. BCT's counsel sent Philips a responsive letter. In a third letter, dated February 16, 2005, Philips' counsel responded to BCT's letter.

Approximately three years later, on January 16, 2008, Plaintiffs and Counter Defendants Philips Electronics North America Corporation, Koninklijke Philips Electronics NV, and Philips Medical Systems (Cleveland), Inc. (hereafter collectively referred to as "Philips") filed this action in the United States District Court, Western District of Washington at Seattle. (Doc. 2-4.) Philips alleged claims of copyright infringement, federal trademark infringement,

misappropriation of trade secrets, tortious interference with business relations, and violation of the Washington Consumer Protection Act. (Doc. 2-4.) Philips sought injunctive relief and damages and requested attorneys' fees and costs. (Doc. 2-4.)

On May 22, 2008, BCT filed a motion to transfer the case to this court (Doc. 2-9), which motion was opposed by Philips (Doc. 2-12). On August 1, 2008, the court granted BCT's motion to transfer, and the case was transferred to this court. (Doc. 3-17.) On August 26, 2008, this court received the documents in this case transmitted from the Western District of Washington, Seattle, and the case was eventually assigned to United States District Judge Clark Waddoups. (Docs. 1-3, 18.) BCT filed its Answer on October 17, 2008. (Doc. 15.) Based on the parties' stipulation, Philips filed an Amended Complaint on March 2, 2009. (Doc. 25.) On May 15, 2009, BCT filed an Amended Answer. (Doc. 55.) On April 9, 2009, Judge Waddoups referred the case to United States Magistrate Judge Samuel Alba pursuant to 28 U.S.C. § 636(b)(1)(A).

On March 20, 2009, Philips filed a motion to compel. (Doc. 32.) The court granted that motion to compel on May 22, 2009. (Doc. 59.) On June 19, 2009, BCT filed a motion to compel. (Doc. 65.) The court granted that motion on July 20, 2009.[1] (Doc. 80.)

On June 23, 2009, hours after being deposed in this case, BCT's Chief Operating Officer, William Biddle, sent an email to all BCT employees stating the following:

---

[1] In July 2009, MSouth Equity Partners acquired BCT. MSouth Equity Partners formed BCT Holdings, Inc. for the purpose of purchasing BCT. (Doc. 262.) Because the distinction between BCT and MSouth does not matter to the court's analysis, and for convenience, the court refers to both BCT and MSouth as "BCT" throughout this Report and Recommendation.

> Folks–
>
> This is a reminder that you are to save any electronic records that could possibly be associated in any way to the Philips' litigation. If there is any question in your mine [sic] then make sure to retain the information.
>
> Feel free to give your respected manager a call if you would like to discuss.

(Doc. 194, Ex. 1.)

On July 10, 2009, Philips filed a second motion to compel responses to Philips' first requests for production. (Doc. 72.) On July 15, 2009, Philips filed a motion to compel BCT to preserve relevant information. (Doc. 75.) In its motion to compel BCT to preserve relevant information, Philips expressed concerns that even though this case had been pending for about eighteen months, BCT had (1) failed to issue a litigation hold memo to its employees to preserve information, (2) failed to modify or suspend document destruction practices in light of the litigation, (3) failed to image the hard drives of its key custodians, and (4) continued its practice of routinely overwriting back-up tapes until Philips brought those problems to this court's attention by motion on July 15, 2009. (Docs. 75-76, 79.) Philips expressed its concern that BCT was destroying key evidence.

On August 18, 2009, the court held a hearing on Philips' two motions. (Doc. 98.) The court granted in part Philips' second motion to compel responses (Doc. 98, 105), and granted Philips' motion to compel BCT to preserve relevant information (Doc. 105).

The court's written order granting Philips' motion to compel BCT to preserve relevant information ordered that within five days of the August 18, 2010 order, BCT shall:

4

> (1) Issue and circulate a thorough litigation hold memo to employees likely to have relevant information. The litigation hold memo should identify categories of relevant information and the subjects of plaintiffs' discovery requests. Further, defendant shall provide a copy of the litigation hold memo to plaintiffs, and identify the persons to whom the litigation hold memo is provided;
>
> (2) Provide all its existing backup tapes to its attorneys and suspend the practice of overwriting any information on those backup tapes until further order of this Court, or the termination of this litigation;
>
> (3) Cease "wiping" or "re-imaging" the hard drives of employees likely to have relevant information until further order of the Court, or the termination of this litigation.

(Doc. 99, at 2.) The order further provided that "this Order is without prejudice to plaintiffs' right to pursue additional relief to ensure that defendant complies with its preservation obligations moving forward, and/or to seek sanctions or spoliation instructions should it be discovered that relevant information has been destroyed." (Doc. 99, at 2-3.) At the August 18, 2009 hearing, BCT's attorney assured the court that he understood the requirements of the order and BCT would "follow it." (Doc. 139, Kindley Dec., Ex. 0 at 37:2-4.)

On August 25, 2009, Biddle circulated another email to all BCT employees. The email's importance was rated "high" and, as instructed by the court's order following the August 18, 2009 hearing, attached a Litigation Hold Memo. The Litigation Hold Memo directed all employees to preserve the following documents on their computers: (1) personnel records for any person who, at any time, was a Philips' employee; (2) correspondence between BCT and Philips; (3) correspondence or written communication between Philips and any third party; (4) brochures, flyers, circulars, website materials, e-mails or other documents relating in any way to

BCT's efforts at marketing goods or services in any way involving Philips' products, such as ADAC, AutoSPECT, AutoQUANT, or Pegasys; (5) price quotes, bids or other written offers to perform services or sell goods, generated either by BCT or Philips; (6) all business records (including, but not limited to, invoices, work orders, bids, quotes, field service notes, billing statements, or correspondence (relating in any way to BCT's servicing, repairing or maintaining any Philips-manufactured device or system); (7) all business records relating to the purchase of any parts or materials from any Philips entity by BCT or by any third party; (8) all service records relating to the installation of software onto repaired or refurbished nuclear medical devices or systems manufactured by Philips; (9) lists or databases of actual or prospective customers of Philips or BCT, concerning the furnishing of repair, maintenance or service on Philips-manufactured devices or systems. (Doc. 194, Ex. 2). The Litigation Hold Memo explained that the foregoing list "does not attempt to itemize all of the types of documents and materials that must be retained, but rather it is intended to provide you with examples of the types of documents that must be retained. If you have any questions regarding whether particular documents must be retained, please contact William Biddle at (801) 280-2900." (Doc. 194, Ex. 2.) The memo also instructed BCT employees in detail concerning how documents were to be preserved. The memo told employees that if they had not already done so, to conduct a diligent search of their on-site files to identify any relevant documents, including the identification of all computer-stored information as well as all paper copies of email, notes, drafts and tapes of telephone conversations, folios, reports, statements, personnel records, payroll records, etc. The memo instructed employees to then contact Biddle to arrange for the documents to be reviewed

by a member of the legal team.  The memo instructed employees not to destroy any potentially relevant documents, even if they otherwise routinely would be discarded or destroyed in the ordinary course of business, including preventing any periodic purging or deletion of documents or information (including emails) off computer systems that otherwise might occur.  The memo told employees that if they needed technical assistance to insure the preservation of documents to contact Biddle.  In addition, the memo instructed employees not to re-use data backup tapes; instead, all backup tapes were to be preserved and provided to BCT's legal counsel.

The memo instructed employees to cease "wiping" or "re-imaging" their hard drives until the lawsuit with Philips was over.  Employees were instructed, for all paper documents that were maintained in filing cabinets or other containers that would be needed to conduct ongoing business, to affix to the cabinet or container a note which stated:  "The contents of this cabinet/container must be retained pursuant to a directive from BCT management.  Make and use copies only.  Do not remove originals except to make copies, and then return originals to the exact location from which they were removed."  Further, employees were told that, to the extent they or their staff may have sent potentially relevant documents off-site to archives or storage, to identify those documents and contact Biddle to obtain further instructions.  In addition, employees were told not to create any new documents describing or commenting on anything contained in this memorandum unless they were directed to do so by BCT or by an outside counsel representing BCT.  (Doc. 194, Ex. 2.)

On July 31, 2009, Philips filed a third motion to compel responses from BCT (Doc. 85), and on August 18, 2009, BCT filed a cross motion for a protective order (Doc. 91).  On

September 22, 2009, the court held a hearing on these two motions. The court verbally granted

Philips' third motion to compel. (Docs. 108, 111, 114.) Philips' attorney made an oral motion

for attorneys fees, which the court granted. (Docs. 108, 111, 114.) The court ordered that all of

BCT's computers and servers be turned over for collection since BCT had not complied with

discovery requests due in July. The court ordered the attorneys for Philips and BCT to finalize a

stipulation regarding the collection of BCT's electronically stored information (hereafter "ESI"),

which was incorporated into this court's written Order Granting Plaintiffs' Third Motion to

Compel and Awarding Sanctions to Plaintiffs. (Docs. 110-11.) The court's written order required

BCT to provide Lighthouse Document Technologies (hereafter "Lighthouse") with "immediate

access to all of BCT's laptops, desk computers and all servers" and to "fully cooperate" in the

process of collecting, retrieving and processing the ESI. (Doc. 111.) The court found moot

BCT's cross motion for a protective order. (Docs. 108, 114.)

　　　　As just mentioned, among other things, the written order following the hearing

incorporated into it the parties' stipulation regarding BCT's ESI. (Docs. 110, 111.) In that

stipulation, signed on September 24, 2009, by attorneys representing both Philips and BCT, the

parties agreed to the following:

> 1.　　　[BCT] shall provide Lighthouse Document Technologies
> ("Lighthouse") with immediate access to all of BCT's laptops,
> desk computers and all servers. [BCT] shall provide a list of all
> business computers located at West Jordan, Utah (or for laptops of
> employees that work from West Jordan) by name of employee, job
> title and length of employment and computer model and serial
> number to counsel for Philips. BCT shall use its best efforts to
> provide this list by the end of the day September 24, 2009. At the
> present time, Philips has designated 10 laptops from field service

engineers that are not located in West Jordan, Utah: these are for Ava Bixler, Mike Landis, Jerry Williams, Ed Sokolowski, Marcus Carter, Scott Dorchin, Paul Schenker, Dan Gasparovich, Steven Cook and Tony Butler. These laptops will be sent to BCT offices in West Jordan and be available by Friday morning at 8:30 am, September 25, 2009, or as soon thereafter as Federal Express deliveries arrive on Friday morning. Philips reserves the rights to designate further laptops at a later time should it be necessary to do so, but this will be coordinated in advance between counsel.

2.      Philips shall pay for the cost of collecting this information, but if BCT wants any of the information or data from Lighthouse, BCT shall pay half the cost of processing the data after it has been collected.

3.      BCT shall make all computers and servers available at West Jordan for Lighthouse. BCT shall turn over all of its backup tapes to Lighthouse for Lighthouse to reproduce in Seattle and Lighthouse will return the original backup tapes to BCT.

4.      Lighthouse will process the electronically stored information that is collected. In the course of processing any email, email that has been sent to or from a domain name of "joneswaldo.com" will be sent to counsel for defendant, Vince Rampton, for review of privilege. That data will be reviewed and any data that should be produced will be produced within 20 days from its receipt to counsel for plaintiffs.

5.      [BCT] will fully cooperate with Lighthouse in the process of collecting, retrieving and processing the electronically stored information. Currently, all parties and Lighthouse anticipate the collection of the data at [BCT's] office can be done on Friday and Saturday, September 25 and 26, 2009.

6.      All data collected by Lighthouse shall be treated as "Confidential" pursuant to the terms of the Protective Order in this case.

7.      Lighthouse will use its own equipment to search BCT's computers and hard drives, and will not download or install any software, applications or programs on any BCT computer.

(Doc. 110.)

As discussed in more detail below, within hours of this court's order, BCT executives and

employees began deleting a massive number of files from their computers just ahead of the

court-ordered collection by Lighthouse of BCT's ESI. (Doc. 140, Norberg Dec. ¶¶ 4-16, Exs. 1-13.)

On the evening of Tuesday, September 22, 2009, BCT's IT Director, Derek Tolboe, sent an email to several BCT employees, including Jerry Williams, Ed Sokolowski, Marcus Carter, and Dan Gasparovich, instructing them to turn in their laptop computers by that Friday. (Exhibit 2 of Plaintiff's Exhibits from the Hearing (hereafter "Ex. __").) In response to that email, Ed Sokolowski sent a reply email requesting a telephone conference, stating: "As Philips continues to 'fish' for information, I (as I am sure others as well) would feel more at ease if the two of you could specifically tell all of us - that we are protected from any personal wrong-doing during the course of our employment with BCT." (*Id.*) As discussed more below, that telephone conference occurred later that week. (Ex. 3.)

Lighthouse began its data collection at BCT's West Jordan, Utah facility on Friday, September 25, 2009. During that process, Lighthouse captured forensic images of the hard drives of eight BCT executives and employees: Chuck Hale, Scott Dorchin, William Biddle, Marcus Carter, Paul Schenker, Ed Sokolowski, Jerry Williams, and Dan Gasparovich. Although BCT had been ordered to do so, BCT failed to provide Lighthouse with access to the laptops of Rex Lindsey, Luciano Albuquerque, or to Chuck Hale's second laptop during Lighthouse's initial collection effort in West Jordan between September 25 and 27, 2009. Philips complained about this noncompliance with the court's order and the parties' stipulation. (Doc. 139, Kindley Dec., Ex. B.) Lighthouse finally was given those last three laptops on October 9, 2009. Once Lighthouse received the three additional laptops, it also took forensic images of their

hard drives.  Lighthouse provided the forensic images it obtained of the computers for the ten

BCT executives and employees directly to Reginald H. Norberg, a computer forensics expert

engaged by Philips, for analysis.  (Doc. 140, Norberg Dec., ¶¶2-3.)

On November 11, 2009, BCT filed a motion to compel production of documents from

Philips.  (Doc. 120.)  At a January 6, 2010 hearing on that motion, the court heard arguments

from counsel and granted Philips' motion to compel.  (Docs. 150, 152.)  BCT filed a third motion

to compel on January 4, 2010.  (Doc. 144.)

On December 21, 2009, Philips filed two of the pleadings now before the court:  a motion

for spoliation sanctions and a motion for an order finding BCT in contempt of court.  (Docs. 135,

136.)  In these two pleadings, Philips alleged that after carefully reviewing the information

Lighthouse provided to Philips from the ten laptops, its computer forensics expert, Reginald H.

Norberg, concluded that within hours of the court's September 22, 2009 order, BCT executives

and employees began deleting a massive number of files from their computers just ahead of the

court-ordered collection by Lighthouse of BCT's ESI.  (Doc. 140, Norberg Dec., Exs. 1-13.)  In

reliance on Norberg's analysis of the ESI, Phillips alleged that BCT had violated this court's

order by willfully and inexcusably destroying evidence, and that deliberate attempts were used to

cover up the destruction of documents and to preclude forensic analysis and recovery of the files.

On January 7, 2010, Judge Waddoups changed his referral to Magistrate Judge Alba; the

new order referred the case to Magistrate Judge Alba pursuant to 28 U.S.C. § 636(b)(1)(B).

Pursuant to BCT's request, the court scheduled an evidentiary hearing as to Philips'

motions for sanctions due to spoliation and contempt.  (Doc. 162.)  On February 2, 2010, eight

days before the scheduled evidentiary hearing, BCT sought to withdraw its motion for an evidentiary hearing, which motion the court denied. (Docs. 167, 171.) The court then held an evidentiary hearing on February 10 and 11, 2010 (hereafter "the Hearing"). (Docs. 180, 181.) On February 17, 2010, Philips filed the third motion now before the court: a second motion for spoliation sanctions and for an order finding BCT in contempt of court. (Doc. 174.)

After it came to light that these BCT employees had deleted thousands of documents from their laptops, BCT began collecting copies of those electronic documents that had also been stored in places other than the BCT laptops. BCT sent to Philips ESI it represented to be the ESI deleted from the laptops that BCT was able to recover.

On April 13, 2010, counsel presented oral arguments to the court regarding Philips' first and second motions for sanctions for spoliation and contempt of court. (Doc. 237.)

## DISCUSSION

The three motions before the court are: (1) Plaintiffs' Motion for Spoliation Sanctions (Doc. 135); (2) Plaintiffs' Motion for Order Holding Defendant In Contempt of Court Pursuant to Fed. R. Civ. P. 37(b) (Doc. 136); and (3) Plaintiffs' Second Motion for Spoliation Sanctions and for Order Holding Defendant in Contempt of Court (Doc. 174). Philips' first motions for spoliation sanctions and for an order holding BCT in contempt of court are based on deletions made on four BCT laptop computers used by the following four BCT employees: Gasparovich, Albuquerque, Williams, and Carter. Philips' second motion for spoliation sanctions and for an order holding BCT in contempt of court is based on deletions made on the BCT laptop used by Sokolowski, another BCT employee. Philips alleges that the forensic examination of these five

12

BCT laptop computers reveals that ESI relevant to this case was destroyed from each of these laptops in violation of the court's direct orders and in violation of discovery rules. In its motions, Philips requests that the court sanction BCT for spoliation and contempt of court by striking BCT's Amended Answer and Counterclaim, entering default judgment as to liability in Philips' favor, dismissing BCT's counterclaims, and imposing monetary sanctions.

## A. Evidence Presented in Support of Philips' Motions

The court first examines the evidence pertaining to the five BCT laptop computers at issue in Philips' three motions before the court. Again, those five laptops were used by the following five BCT employees: Gasparovich, Albuquerque, Williams, Carter, and Sokolowski.

### 1. *Gasparovich*

Dan Gasparovich is a member of BCT's executive management team.[2] Gasparovich is BCT's Chief Technical Officer, a Regional Sales Manager, and is a former employee of Philips/ADAC Laboratories (hereafter "ADAC").[3] *See* Official Transcript of Evidentiary Hearing Regarding Motion for Spoliation and Sanctions, Docs. 184 and 186 (hereafter "Tr. at __") at 16-18.[4]

---

[2]Before BCT was acquired by MSouth, Gasparovich was also a part owner of BCT.

[3]Philips acquired the ADAC's stock and all of its assets. (Doc. 2-16, Declaration of Edward A. Uhl, at 1.)

[4]The court cites to the page numbers contained within the Hearing's transcript, rather than the page numbers given to the documents by the court. Thus, Document 186, Volume II of the transcript, begins on page 326.

At Gasparovich's deposition, Gasparovich admitted that he had deleted ESI from his laptop on September 22, 2009, but twice insisted that his deletions all took place before he received Derek Tolboe's email instructing him to send his computer to BCT. *See* Tr. at 52. Gasparovich repeatedly denied deleting ESI after learning that he had to send in his laptop:

> Q. Was your laptop one of the laptops that was sent in?
> A. Yes.
> Q. And after you learned that you were going to have to send your laptop in, did you make any changes to any other files on your laptop?
> A. Not that I'm aware of.
> . . .
> Q. Did you delete any documents from your laptop after learning that you would have to send your laptop in to be imaged?
> A. Not that I'm aware of.
> Q. Did anyone other than yourself have access to your laptop after you learned that the laptop was going to have to be sent in?
> A. Not that I'm aware of.
> . . .
> Q. This is along the same lines but a little bit different. I just want to make sure we cover this area. What about overwriting any files? We have talked about deleting or erasing, destroying documents. I understand you testified that you didn't do any of that.
> A. Right.
> Q. What about overwriting files?
> A. No.
> . . .
> Q. Other than the kind of deleting, overwriting that we have talked about, did you do anything else to your computer that would have affected any of the files on your laptop after you learned that the laptop was going to have to be sent in?
> A. No.

(Doc. 139-6, Kindley Dec., Ex. J at 3:14-20, 4:4-11, 5:20-6:3, 6:9-15.) In short, at his deposition, Gasparovich repeatedly testified under oath that he did not delete, erase, destroy, or overwrite files after he learned that he needed to send his laptop to BCT.

Gasparovich again testified at the Hearing. During that testimony, as at his deposition, Gasparovich testified three different times that all his deletions of ESI that took place on September 22, 2009, occurred before he received the Tolboe email instructing him to send his computer to BCT. *See* Tr. at 47-48. In response to BCT's counsel's questioning, Gasparovich reiterated for the fifth time that he had not received Tolboe's email before he deleted the files from his computer. *See* Tr. at 84. Gasparovich also testified that, to his knowledge, he did not destroy or delete any documents related to this lawsuit. *See* Tr. at 54. At the Hearing, Gasparovich testified that, while he was at home in Tennessee, he spent two or three hours deleting files and folders from his computer. *See* Tr. at 57-8, 73. Gasparovich admitted he either deleted the TAC database from his BCT computer or he transferred it to an external hard drive on September 22, 2009. *See* Tr. at 65-66. In addition, Gasparovich testified that he copied five movies onto his BCT laptop so he could watch them during an upcoming business trip. Gasparovich explained that he was driving for approximately five hours to Nashville on September 23, 2009 (the day after he made the deletions), staying in a hotel that night, and then sending his computer to BCT the following day, September 24, 2009. *See* Tr. at 71-3.

Gasparovich testified that he did not recall how many electronic folders he removed from his BCT computer. *See* Tr. at 56-7. He also did not know what ESI was moved to the recycle bin. *See* Tr. at 58. Gasparovich admitted that he could not honestly say that everything he deleted from his computer on September 22, 2009, was on the replacement hard drive later provided to Philips. *See* Tr. at 85. Gasparovich admitted that he did not know everything that he had actually deleted from his computer. *See* Tr. at 88. Ultimately, Gasparovich admitted that the

15

files that were on the replacement hard drive later given to Philips did *not* include all the files that he actually deleted on the night of September 22, 2009.  *See* Tr. at 89.

Gasparovich also testified that "[t]here was never any official notification" by BCT's management informing its employees about the Philips lawsuit; instead, employees found out about the lawsuit through hearsay. *See* Tr. at 28.  Gasparovich testified that, after the lawsuit was filed, BCT did not change its practices to ensure that relevant documents stored on its computers were not deleted or destroyed. *See* Tr. at 32.  Gasparovich testified that, before receiving the email instructing him to send in his laptop computer, which he received on September 22, 2009, he had never been informed that the court had ordered BCT to cease wiping or re-imaging its computer hard drives.  *See* Tr. at 33.  Gasparovich testified that he had not understood that BCT had a duty to preserve ESI or the documents it had obtained related to Philips.  *See* Tr. at 33-34.

In addition, Gasparovich testified that he had never seen the Litigation Hold Memo until it was shown to him at the Hearing, *see* Tr. at 30; however, in his January 20, 2010 sworn Declaration, Gasparovich testified that he received the Litigation Hold Memo in August of 2009, and the Litigation Hold Memo was attached as Exhibit 1 to his sworn Declaration, *see* Ex. 52 at ¶ 9.  Gasparovich admitted that he failed to "look at" Exhibit 1 to his Declaration, and he only "[s]cantily, not in great detail" read his Declaration itself before he signed it.  Tr. at 32, 87.  Gasparovich also testified that he must have received the email when it was sent out because it was sent to all BCT employees, but he must not have read it.  Tr. at 32, 82-84.

Finally, Gasparovich also testified that he understood that the BCT laptop he used was a company laptop, that the ESI on BCT's computers is BCT's property, and that BCT had the right to access the laptop at any time at its sole discretion. *See* Tr. at 34.

Norberg analyzed the information obtained from Gasparovich's laptop. According to Norberg, Tolboe's email was sent to Gasparovich on September 22, 2009, at 5:29 p.m. *See* Ex. 33. Gasparovich sent a reply email to Tolboe at 6:29 p.m. *See id.*; *see also* Tr. at 50. Norberg determined that Gasparovich started deleting documents from his computer at 5:39 p.m. on September 22. *See* Ex. 68. (Note that the first row of page 1 of Ex. 68 shows that File Dc31 was modified (deleted) on September 22, 2009 at 5:39 p.m.) According to Norberg, Gasparovich continued to delete documents from his computer over the next 5 ½ hours, with the last file or folder (Dc192) being deleted at 11:06 p.m. *See* Ex. 68. Norberg testified that one of the folders deleted from Gasparovich's laptop was named "Dave Miller SKYLight," which contained over 1,700 files, *see* Tr. at 390-92, and Gasparovich testified that Dave Miller was a former trainer of Philips engineers who provided Philips' SKYLight files to Gasparovich, s*ee* Tr. at 60-62.

Norberg testified that his analysis of Gasparovich's laptop revealed that the My Documents folder on that laptop, which contained hundreds and hundreds of files, were scanned and folders were selectively picked and sent to the recycle folder beginning at 5:30 p.m. and continuing until after 11:00 p.m. on September 22, 2009. *See* Tr. at 387-88. Norberg testified that these deletions did not happen automatically or by accident. *See* Tr. at 388.

According to Norberg, after Gasparovich deleted files and folders for over 5 ½ hours, he then started loading five movies onto his computer on September 23 at 12:02 a.m. *See* Tr. at

394. The five movies, which comprised approximately twenty gigabytes of data, permanently overwrote the files recently deleted, eliminating the possibility of forensically recovering them. *See* Tr. at 376-77, 394-95; Ex. 62 at ¶¶ 5-7. Norberg testified that this activity was consistent with the actions of a "knowledgeable user" trying to achieve a result where the data would be permanently removed from the computer.[5] *See* Tr. at 397. (Ex. 62 at ¶ 7, Ex. 2.)

Norberg testified that although the contents of the files have been destroyed, some of the file and folder names remain. (Doc. 140, ¶¶ 6-7, Ex. 1.) For example, the file names of a significant number of files deleted from Gasparovich's laptop directly match the names of confidential and propriety documents internal to Philips.[6] (*Compare* Doc. 140, Norberg Dec., ¶

---

[5]Norberg also found evidence that numerous additional files were deleted from Gasparovich's computer on March 25, 2009, two months after Philips served its First Set of Requests for Production of Documents and five days after Philips' first Motion to Compel. (Doc. 32-34; Norberg Dec., ¶ 6, Ex. 1.)

[6]During his employment with Philips/ADAC, Gasparovich was privy to Philips/ADAC's confidential and proprietary information and, in consideration of and as a condition of his employment with them, Gasparovich signed a Company Information and Invention Agreement. That agreement provided:

> I agree not to disclose to others or use for my own benefit during my employment by ADAC or thereafter any trade secrets or company private information pertaining to any of the actual or anticipated business of ADAC or any of its customers, consultants, or licenses, acquired by me during the period of my employment, except to such an extent as may be necessary in the ordinary course of performing my particular duties as an employee of ADAC.
> . . .
> I further agree that all papers and records of every kind, relating to any invention or improvement included within the terms of this Agreement which shall at any time come into my possession shall be the sole and exclusive property of ADAC and shall be surrendered to ADAC upon termination of my employment by

6, Ex. 1, *with* Doc. 139, Kindley Dec., ¶ 6. Ex. E.)  According to Philips, that confidential

information is only available to certain Philips' employees, licensed representatives, or alliance

customers who sign nondisclosure and confidentiality agreements.  (Doc. 139, Kindley Dec., ¶ 6,

Ex. F-G.)  In order to access these materials, a person also must have a legitimate Philips

validation code.  (*Id.*)

Norberg determined that at least 100 files from Gasparovich's computer cannot be

recovered, and Hooper, BCT's expert, agreed with this finding.  *See* Tr. at 447-448; Tr. at 461,

466.

Gasparovich's testimony lacks credibility for several reasons.  First, Norberg's analysis

reveals that Gasparovich's deletions began within ten minutes after receiving Tolboe's email and

continued over the next 5 ½ hours.  Gasparovich's reply email to Tolboe was sent approximately

one hour after Tolboe sent the email, and approximately 50 minutes after Gasparovich started

deleting files, confirming that Gasparovich received Tolboe's email by that time, and that at least

the majority, if not all, of Gasparovich's deletions occurred after he was notified that he would

have to send in his BCT laptop for examination, *see* Ex. 33; however, Gasparovich repeatedly

testified that his deletions occurred before he received Tolboe's email and that he spent only two

to three hours deleting files and folders from his computer.  *See* Tr. at 50.  Second, Gasparovich

testified that, to his knowledge, he did not destroy or delete any documents related to this lawsuit,

---

ADAC, or upon request at any other time either during or after the
termination of such employment.
(Doc. 139, Kindley Dec., ¶ 5, Ex. D.)

but Norberg's analysis revealed that Gasparovich deleted a folder containing 1,700 files from the folder suggestively named Dave Miller SKYLight, and Gasparovich himself testified he deleted the Philips TAC database from his laptop.  Third, Norberg testified that Gasparovich had selectively picked which folders to delete beginning at approximately 5:30 p.m. and continuing after 11:00 p.m., revealing that Gasparovich's deletions were deliberate and not accidental or inadvertent.  Fourth, it is difficult to imagine that one would spend 5 ½ hours making room for and then loading five movies onto a computer, when he was simply driving to Birmingham on September 23, 2009, and then sending his computer to BCT the next day, September 24, 2009.  Fifth, the fact that Gasparovich, a "knowledgeable user,"[7] loaded enough movies onto his BCT laptop so as to use virtually all of its available memory, and thereby overwrite nearly every single document deleted over those 5 ½ hours, especially when combined with Norberg's other findings, is too coincidental.  *See* Tr. at 394-96; Ex. 62 at ¶¶ 5-7.  Norberg testified that computers typically have 20, 30, 50 or 100 gigabytes of unallocated space; Gasparovich (when he was done with loading videos) had taken up all but two gigabytes of space.  *See* Tr. at 395.

The testimony and evidence presented regarding Gasparovich's BCT laptop reveal that BCT did not and could not provide Philips with copies of all the files Gasparovich deleted. Gasparovich himself testified that he could not identify all the documents that he deleted and that the replacement disk later provided to Philips did not contain all the deleted data.  Further, Gasparovich's deletion and overwriting of the files deprives Philips of the ability to analyze

---

[7]As Chief Technical Officer of BCT, Gasparovich could be considered a "knowledgeable user."

metadata that the deleted and overwritten files may have contained in order to assess how, when, and from whom BCT acquired those files.

Although the contents of the files have been destroyed, some of the file and folder names remain and indicate that many of the deleted files were probably relevant to this lawsuit. (Doc. 140, Norberg Dec., ¶¶ 6-7, Ex. 1.) Given Gasparovich's destruction of these files, Philips is precluded from discovering the contents of all the files, although the exact match between various file names destroyed by Gasparovich to the names of Philips confidential and proprietary files suggests what the contents of those files likely entailed.

The folder structure of the files Gasparovich deleted further demonstrates the relevance of the deleted files to this litigation. This litigation involves claims of copyright infringement and trade secret misappropriation, among others. (Doc. 25.) A portion of Philips' copyright claim relates to BCT's copying and distribution of copyrighted service manuals. (Doc. 25 at 5-6.) Philips asserts that discovery has revealed that BCT uses, makes copies, and distributes Philips/ADAC service manuals in its training programs. (*See, e.g.*, Doc. 139, Kindley Dec., ¶ 7, Exs. H, I (answers to Request No. 8 and Interrogatory No. 2).) The folder structure of the files Gasparovich deleted reveals that a substantial portion of the deleted files constituted precisely this type of technical training materials, handouts, and schematics for Philips/ADAC brand nuclear medicine systems, including Forte, Single Bead Genesys, Skylight, and Vellex. (*See* Doc. 140, Norberg Dec., Ex. 1.) Two other files deleted by Gasparovich literally were titled "copyright..Philips_medical_system.htm." (*Id.*)

Although there is an exact match between various file names destroyed by Gasparovich to the names of confidential and propriety files belonging to Philips, Gasparovich's destruction of these files precludes Philips from discovering the contents of all the files. Philips thus cannot discover or understand the full scope of BCT's trade secret misappropriation and copyright infringements, impeding Philips' ability to obtain evidence relevant to its claims and defenses in this case.

### 2. Albuquerque

Luciano Albuquerque is BCT's Vice President of Product Development and a district manager for New York City. *See* Tr. at 301. Albuquerque was hired by BCT in 2006. Like Gasparovich, Albuquerque is also a former employee of Philips/ADAC and, while employed by Philips/ADAC, had agreed to and executed multiple confidentiality, non-disclosure and intellectual property agreements with Philips/ADAC. *See* Tr. at 302, 340-41. In addition to the same undertakings agreed to by Gasparovich (set forth above), the agreements executed by Albuquerque further provided, among other things:

> 1. Unless I first secure ADAC's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION[8] of which I become

---

[8]"CONFIDENTIAL INFORMATION" is defined as "information disclosed to me or known by me as a result of my employment by ADAC, not generally known to the trade or industry in which ADAC is engaged, about ADAC's products, processes, machines, and services, including but not limited to research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling and servicing, and corresponding information about the products, processes, machines, and services of ADAC's affiliates, acquired by me during my employment by ADAC. The above includes any training, training materials, or any other information provided by ADAC in relation to the installation, maintenance or repair of

informed during my employment with ADAC, whether or not developed by me.

2. Upon termination of my employment with ADAC, I shall turn over to a designated individual employed by ADAC all property then in my possession or custody and belonging to ADAC. I shall not retain any copies or reproductions of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents relating in any way to the affairs of ADAC or to the affairs of its affiliated companies and which are entrusted to me at any time during my employment with ADAC.

3. In consideration of my accepting or continuing work at Philips Electronics North America Corporation or any of its divisions, subsidiaries or affiliates, (which will individually and collectively be called "the company") during such time as may be mutually agreeable, and in consideration of the salary or wages paid to me, I agree:

4. Not to use, publish or otherwise disclose (except as my job requires) either during or after my employment, any secret or confidential (proprietary) information or data of the company or its customers or any other third party received by the company in confidence.

5. Upon the termination of my employment, to deliver promptly to the company all written and other materials that relate to the business of the company or its affiliates.

(Doc. 139, Kindley Dec., Ex. K.)

Despite agreeing to the terms of the confidentiality and non-disclosure agreements

discussed above, Albuquerque admitted at his deposition that he kept Philips/ADAC technical

products manufactured, sold, or distributed." (Doc. 139, Kindley Dec., Ex. K.)

information regarding these products (which he had worked on while at Philips/ADAC) and also

admitted loading the materials onto his BCT laptop.[9]

> Q. When you were in Milpitas working for Philips/ADAC, did they provide you with a computer to use?
>
> A. Yes.
>
> Q. Was it a desktop computer, Mr. Albuquerque, or did they provide you a laptop, or what did you get?
>
> A. A laptop.
>
> Q. And was it the Philips/ADAC property?
>
> A. Yes.
>
> Q. When you left Philips/ADAC, did you take that laptop with you?
>
> A. No.
>
> Q. How did you take these files then?
>
> A. I had always a backup in a flash drive.
>
> Q. Okay. How did you decide which files that you were going to keep in a flash drive?
>
> A. All the files that I were working on.
>
> Q. So everything that you worked on while you were there at Milpitas as the electrical design engineer for Philips ADAC was

---

[9]Lighthouse did not obtain access to Albuquerque's laptop until October 9, 2009, after Philips' counsel wrote to BCT's attorneys on October 1, 2009, demanding that Albuquerque's laptop be sent from New York (where Albuquerque lives and works) to Lighthouse in Seattle, Washington, pursuant to the court's order compelling BCT's production of ESI. (See Kindley Dec., Ex. B.)

> put onto a flash drive, and when you left you took that flash drive with you?
>
> A. Yes.
>
> Q. Then after that, did you begin working for BC Technical?
>
> A. Yes.
>
> Q. And did you then take that flash drive and load all those files onto the computer that BC Technical gave you?
>
> A. Yes.

(Doc. 139, Kindley Dec., Ex. L.) Albuquerque again admitted to taking the Philips/ADAC files at the Hearing. *See* Tr. at 302-05.

Unlike Gasparovich, Albuquerque admitted at his deposition to deleting files on the eve of turning over his computer. Albuquerque testified that he had only kept Philips/ADAC materials in order to be able to answer technical questions that he may later get from Philips.

> Q. Tell us to the best of your recollection exactly what you did delete from your computer?
>
> A. I deleted some information about my immigration, like immigration forms, something like that, and a directory with several design documents that I work on Milpitas, California that I didn't disclose to BC Technical.
>
> And maybe I can add that I kept those files because after I left Philips Ray Donbroso sent me an e-mail, I left in my personal e-mail with him, if he had any questions or any problems to send me e-mails or–I didn't have a cell phone at that time because I was moving back to New York–and he sent me an e-mail with an attachment file that was one of the design documents and ask me to update that document because it was not updated and send back to him. This is after I left Philips.

So I had to go back and try to find some of my old design documents because I had just spent two weeks with him reviewing all the documents and give to him.

So I found one and was able to update the file and send back to him. Then I decide to keep a copy of the file in case they need it again.

Q.  You were telling us before you sidetracked under that little explanation what documents you deleted from your computer before you turned it over to Lighthouse in accordance with the court order?

A.  Philips documents standard operating procedures and design documents that I work on.

Q.  What design documents?

A.  I do not recall offhand.  It was in a directory and I delete that directory.

Q.  Did it have documents on Precedence?

A.  On the design that I did for cost reduction on the Precedence, yes, part of the work I did on the Precedence.

Q.  Did it have documents on what was Apollo and that then became Brightview?

A.  Yes.

Q.  What other documents, design documents, from Philips/ADAC, did you have on your computer that were deleted besides those two?

A.  Perhaps I had some information about the aREa project. I do not recall, because like I said, I work on the aREa project for a few months, and I had standard operating procedures.

Q.  Do you know roughly how many gigabytes or megabytes of data that you deleted?

A.  I'm not sure.

Q.  Do you know how many documents that we're talking about?

A.  Probably around 20 documents, 20 to 30 documents.
Normally, they are a small document because I text the documents.

(Doc. 139, Kindley Dec., Ex. L.)

In his testimony at the Hearing, Albuquerque again admitted that when he left Philips'

employment he took design documents and design information on Philips' medicine systems

(including BrightView and Precedence) on a flash drive and he later copied these files onto his

BCT laptop computer.  *See* Tr. at 303-4.  Albuquerque testified he was not sure how many

documents he deleted from his laptop.  *See* Tr. 307-09.  As at his deposition, Albuquerque

testified that he only loaded the data onto his BCT computer so he could respond to questions

about his work from his former manager at Philips who had sent him an email the day after

Albuquerque left Philips.  *See* Tr. at 349-50.  Albuquerque claimed he kept this data on his BCT

computer in case he received other questions.  *See id.*  He never did receive any other questions

from Philips; but kept this data on his BCT laptop computer for the ensuing 14 or 15 months

until he deleted it on October 2, 2009.  *See* Tr. at 367-69.  He testified that he deleted the

directory that contained these electronic files from his BCT laptop computer and then ran

"Cipher.exe" to make sure the deleted documents could not be recovered just before he sent the

laptop computer to BCT.  *See* Tr. at 306-7, 307-08, 343-44.

Albuquerque testified that, other than his personal files, he only deleted files to prevent

BCT from seeing them.  *See* Tr. at 319.  Albuquerque testified that he did not know his laptop

was being sent to Lighthouse; instead, all he knew is that BCT had asked him to send his laptop to BCT. *See* Tr. at 320-21. Albuquerque testified that he deleted the Philips/ADAC files from his computer so as not to share them with BCT and to be true to the confidentiality agreement he had signed while at Philips/ADAC. *See* Tr. at 357. Albuquerque testified that he then ran Cipher before sending in his laptop computer because he did not want BCT to have the design documents he had from Philips. *See* Tr. at 344. Albuquerque testified that until November 17, 2009, when he was asked to sign it, he was unaware of the confidentiality agreement and Protective Order in place. *See* Tr. at 366.

Finally, at the Hearing Albuquerque testified that he did not find out that he had to send in his laptop until October 2009. *See* Tr. at 306-07. He also testified that he was not aware there was a first wave of people who were told to send in their laptops, and he was even unaware of that as he testified at the Hearing. *See* Tr. at 307. He testified that he was unaware of the earlier conference call that occurred between several of the people in the group that first sent in the laptops. *See* Tr. at 316. Albuquerque testified that no one ever had a conversation with him about why he had to send in his laptop or that his laptop was going to Lighthouse to be imaged. *See* Tr. at 317, 319. Albuquerque testified that all he knew was that he was shipping his laptop to BCT in Salt Lake City. *See* Tr. at 319.

Albuquerque testified that during the first twenty months of this lawsuit, no one at BCT ever contacted him to get relevant information on his computer. *See* Tr. at 313-14. Albuquerque testified that until a couple of days before his deposition in November 2009, he had never read Philips' Complaint. *See* Tr. at 309-10. Up to that point, Albuquerque had believed that Philips'

claims were limited to trademark or copyright infringement and he was unaware of Philips' other claims. *See id.* Albuquerque testified that he had never been shown a copy of the Protective Order in this case. *See* Tr. at 310. Albuquerque initially testified that he did not receive a copy of the Litigation Hold Memo. *See* Tr. at 310-11. Upon further questioning by BCT's counsel, Albuquerque changed his testimony and said, "[he] believe[d] [he] received" the email transmitting the Litigation Hold Memo because it was sent to all employees, but he did not recall receiving it. *See* Tr. at 361-62. Albuquerque testified that if he received the Litigation Hold Memo in an email, he probably did not read it because he gets a lot of emails every day. *See* Tr. at 314-315. He further testified that it is common knowledge in the company that most employees do not read emails from management and, if he wants to communicate something that is really important, he calls the person directly or sets up a conference call. *See id.* Albuquerque testified that no one ever told him in a phone call that he should cease wiping or re-imaging his BCT laptop's hard drive. *See* Tr. at 317-18.

Albuquerque testified that the first time an attorney talked to him about his deletion and destruction of ESI was February 9, 2010, the day before he testified at the Hearing, and it was not until then that he understood there was an issue with what he had done. *See* Tr. at 311-12. Moreover, no one from BCT ever contacted him for the purpose of responding to discovery requests or to tell him that the proprietary information he deleted about Philips' newest nuclear medicine system, BrightView, was an essential part of this lawsuit, or that that information was responsive to Philips' discovery requests. *See* Tr. at 314. Albuquerque testified that he was

never informed about, or shown, the court's orders, including the order compelling BCT to preserve data. *See* Tr. at 317-18; Exs. 77, 78.

Albuquerque testified that he had been told by BCT not to delete anything relating to the Philips lawsuit. *See* Tr. at 313. Albuquerque testified that in his mind, when he deleted the files from his computer, they did not relate to the Philips lawsuit because he never gave any of those documents to BCT. *See id.*

Norberg also analyzed Albuquerque's BCT laptop. That analysis revealed that Albuquerque deleted and intentionally wiped files from his computer on October 2, 2009, the day after Philips demanded his laptop be turned over. (Doc. 140, Norberg Dec., ¶¶ 8-10, Exs. 3-4; Doc. 139 Kindley Dec. ¶ 3, Ex. B.) The analysis revealed that Albuquerque then twice ran a Microsoft program called "Cipher.exe" on October 2, 2009, once at 11:52 a.m. and again at 2:31 p.m. (Doc. 140, Norberg Dec., ¶ 9, Ex. 4.) Albuquerque last shut down his computer before sending it in for data collection the afternoon of October 2, 2009. (Doc. 140, Norberg Dec., ¶ 8.) Cipher, which Albuquerque used to wipe the data from his hard drive, is described as follows:

> Cipher.exe is a command-line tool (included with Windows 2000) that you can use to manage encrypted data by using the Encrypting File System (EFS). As of June 2001, Microsoft has developed an improved version of the Cipher.exe tool that provides the ability to permanently overwrite (or "wipe") all of the deleted data on a hard disk. This feature improves security by ensuring that even an attacker who gained complete physical control of a Windows 2000 computer would be unable to recover previously-deleted data.

(Doc. 140, Norberg Dec., ¶ 8 (quoting Microsoft description of the Cipher program, http://support.microsoft.com/kb/298009).) Norberg explained that Cipher overwrites the

unallocated space of a drive; once a file is deleted, its location becomes unallocated and subject to overwriting by Cipher. (Doc. 140, Norberg Dec., ¶¶ 8-10.) Norberg testified that normally, as a computer is used, unallocated space becomes populated with file fragments, random bits of text and binary information, deleted files not yet overwritten, and data from memory. This can be valuable evidence during a forensic computer examination, but the use of Cipher eliminates such possible evidence. (Doc. 140, Norberg Dec., ¶ 10.)

Based upon the accessed and modified folder dates on Albuquerque's computer, Norberg was able to confirm that in excess of 2,200 files were deleted and emptied from Albuquerque's recycle folder beginning at 11:49 a.m. EDT on October 2, 2009. (Doc. 140, Norberg Dec., ¶ 8, Ex. 3.) As mentioned above, Cipher was then run at 11:52 a.m. and again at 2:31 p.m. EDT. (Doc. 139, Norberg Dec., ¶¶ 8-9, Ex. 4.) The contents of those files were permanently destroyed. (Doc. 139, Norberg Dec., ¶¶ 8-10; Ex. 62 at ¶¶ 8-10; Tr. at 441-42; Ex 73.) Hooper, BCT's own computer forensic expert, agreed that these files were not recoverable. *See* Tr. at 461.

Because Cipher does not overwrite file names (Doc. 139, Norberg Dec., ¶ 16, Ex. 3), Norberg was able to ascertain the names of some of the files that Albuquerque permanently deleted and wiped on October 2, 2009. The file names include, among many others:

• Problems with the Precedence at MSKCC-NY.doc;

• 9343-2141 S Forte Exchanger factory test procedure.doc;

• Forte Exchanger Tech-tip.doc;

• InfoTip Precedence No SPECT Gantry Motions.doc;

• InfoTipForm -F0l1e Exchanger stops during motion.doc;

- jetstream_ workspace_2.pdf;

- Site planning FOl1e example. pdf;

- Precedence_reference_ifu.pdf;

- Precedence _getting_started _ifu.pdf

- Precedence_ICG.pdf;

- 9202_5022C_Rev_A.pdf;

- PHP Tech-Tips.rtf

- Value Proposition Precedence I-Wire Alternative to RFID.xls.

(Doc. 140, Norberg Dec., Ex. 3.)  As with Gasparovich's deleted files, some of the files deleted and wiped by Albuquerque have identical file names to internal Philips' documents that are confidential, proprietary, and only available to certain Philips employees, licensed representatives, or customers who sign nondisclosure and confidentiality agreements and have legitimate Philips validation codes.  *(Compare* Doc. 139, Norberg Dec., ¶ 8, Ex. 3, *with* Doc. 140, Kindley Dec., ¶ 6, Ex. E.)

Other file names suggest that the deleted files were relevant to this lawsuit.  For instance, "Tech Tips" is one category of trade secrets that Philips asserts BCT misappropriated and, generally speaking, constitutes a compilation of trouble shooting tips developed over the years by Philips/ADAC to improve the efficiency of its nuclear medicine service.  Further, the apparent technical information concerning Precedence, Forte, and JetStream presumably related to the Philips/ADAC nuclear medicine systems and workstation by those names.

Unlike other BCT witnesses, Albuquerque's deposition and testimony are generally consistent with each other and the evidence presented; however, inconsistencies exist within Albuquerque's testimony and between his testimony and evidence presented by Philips. First, Albuquerque testified at the Hearing, "The only documents that I took [from Philips] was the ones that I worked on." Tr. at 304. Albuquerque subsequently admitted, however, that he also took a CD of the TAC database when he left Philips. *See* Tr. at 331, 335. Second, Albuquerque testified he did not think he deleted Philips' Tech Tips database from his BCT laptop computer, because he believed it was still on his laptop.[10] The evidence, however, shows that he deleted a Tech Tips database from his BCT laptop, as well as a Forte Exchange Drive folder. *See* Tr. at 439-40; Ex. 74. Third, Albuquerque testified in his deposition that he only deleted 20 or 30 documents from his BCT computer, *see* Tr. at 307-08, while the evidence reveals that he deleted 2,200 files from his recycle folder on October 2, 2009, *see* Ex. 62 at ¶ 8.

Despite those inconsistencies, even were the court to completely accept Albuquerque's explanation for deleting the files and then wiping his computer to prevent BCT from seeing them, *see* Tr. at 319, this testimony does not relieve BCT of responsibility for the destruction of these documents. If BCT had communicated with Albuquerque in a way so as to be certain he received the information regarding this lawsuit, including informing him of what was actually going to happen to his laptop – that it was being sent to Lighthouse to be imaged pursuant to this court's order – the destruction of Albuquerque's ESI could have been avoided because

---

[10]Albuquerque testified that he obtained the Philips Tech Tips database from BCT, and that the Tech Tips were on BCT's server. *See* Tr. at 333, 339-40.

Albuquerque would have know that the information obtained from his laptop was going to be sent to Philips rather than BCT.  *See* Tr. at 320-21.

In any case, both Norberg and Hooper agree that Albuquerque deliberately and permanently destroyed 2,200 files from his computer so that Philips cannot recover any of that data.  *See* Tr. at 440-41; Tr. at 460-461; Doc. 140, Norberg Dec., ¶ 8, Ex. 3.  Albuquerque testified the Philips design and schematic files he deleted were totally unrelated to anything he did at BCT, s*ee* Tr. at 355; however, because this data was irretrievably destroyed,  Philips is precluded from examining the files to confirm or disprove this assertion.  Moreover, because the documents were destroyed and overwritten, Philips is precluded from reviewing them to determine when they were last accessed or changed so as to confirm or disprove Albuquerque's testimony as to why he kept that information on his computer.

### 3. Williams

Jerry Williams is a field service engineer for BCT and, like Gasparovich and Albuquerque, is also a former employee of Philips/ADAC.  *See* Tr. at 220.  Also like Gasparovich and Albuquerque, in connection with his employment with Philips/ADAC, Williams executed numerous confidentiality and nondisclosure agreements.  *See* Tr. at 221-22; Ex. 59.; Doc. 139, Kindley Dec., ¶ 11, Ex. M.  Some of the terms of those agreements include the following:

> Unless I first secure ADAC's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION of which I become informed during my employment with ADAC, whether or not developed by me.

Upon termination of my employment with ADAC, I shall turn over to a designated individual employed by ADAC all property then in my possession or custody and belonging to ADAC. I shall not retain any copies or reproductions of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents relating in any way to the affairs of ADAC or to the affairs of its affiliated companies and which are entrusted to me at any time during my employment with ADAC.

. . .

I will hold in confidence and not disclose to others, or use for my own benefit, either during or after my employment or engagement by ADAC, any Confidential Information that I learn, obtain or create during the period of my employment or engagement with ADAC, whether or not during working hours, except to the extent otherwise authorized by ADAC. For purposes of this Agreement, "Confidential Information" means information designated or otherwise considered by ADAC to be confidential or proprietary, non-public information not known by actual or potential competitors of ADAC, and confidential or proprietary information of ADAC's customers, suppliers, licensors, and other third parties with whom ADAC does business, including all confidential or proprietary information that ADAC is required to keep confidential.

. . .

Upon termination of my employment or engagement, or upon earlier request of ADAC, I will return or deliver to ADAC all property belonging to ADAC and all tangible forms of Confidential Information in my possession or control, including but not limited to drawings, specifications, documents, records, devices, models or any other material and copies or reproductions thereof. I will provide to ADAC, at its request, written certification that I have returned all property and Confidential Information to ADAC and that I will continue to honor my confidentiality obligations hereunder.

Ex. 59; Doc. 139, Kindley Dec., ¶ 11, Ex. M..

In addition, Williams executed two separate Certificates of Compliance, in which he acknowledged that:

> [A]ny material, non-public information concerning the Company or any customer, supplier or other corporation with which the Company has a relationship which comes into my possession is a valuable asset of the Company and I shall not use such information for my own personal gain (by stock trading or otherwise) nor pass such information to, or allow it to be used by, other persons.

(*Id.*)

In his Declaration, Williams declared, under oath, the following statement: "I hereupon deleted from the computer all documents contained within the file C/Documents and Settings/Jerryw/My Documents, thinking that in so doing, I was removing only my personal data from the computer." Tr. at 249; Ex. 55. Williams also declared that the folders with "add" seemed to be "predominately windows temporary files." Tr. at 254; Ex. 55. Further, Williams declared, "These files are temporary copies of information downloaded from Internet sites, and they have no knowledge of their contents beyond this." Tr. at 255; Ex. 55.

At the Hearing, Williams testified that he could not remember when he first heard about this lawsuit, but he thought he had heard in 2008 that there was a lawsuit. *See* Tr. at 223. Williams testified that in March 2009, he attended a BCT meeting where the lawsuit was discussed, but he could not recall that he had been told at that time to save information on his laptop. *See* Tr. at 224. Williams testified that no one at BCT ever contacted him to get information on his laptop that was relevant to this lawsuit. *See* Tr. at 234. He testified that he never received or saw Biddle's June 23, 2009 email because his computer hard drive had crashed

and he was having a hard time with his email.  *See* Tr. at 225, 275.  Williams further testified that

although he received the August 25, 2009 email to which the Litigation Hold Memo was

attached, he "didn't take the time to read that email."  Tr. at 225-226.  Williams explained that he

did not see that the email had been labeled "importance high" because he was retrieving his

emails on his cell phone, and his cell phone doesn't show that information.  *See* Tr. at 226.

Williams testified that he first read the August 25 email on approximately January 21, 2010,

when he attended a meeting to prepare his Declaration.  *See* Tr. at 228.  Further, Williams

testified that he had never seen this court's August 18, 2009 order, or this court's September 24,

2009 order.  *See* Tr. at 264.  Williams thought the September 24 email was attached to the

October email from BCT, but he did not actually know whether that was true.  *See* Tr. at 265.

     Williams testified that he knew the laptop he used was BCT property and that BCT had

the right to come and take the laptop, access files on the laptop, and so on because it was the

company's laptop.  *See* Tr. at 234-35.

     Williams testified that his BCT laptop crashed in June 2009, and it was determined that it

needed a new hard drive.  *See* Tr. at 241, 242.  As a result, Williams used his home desktop

computer.[11]  When he received his new laptop, which contained no data, he transferred the data

off his desktop and put everything into a folder called "My Documents."  *See* Tr. at 241.  Within

that folder were files containing personal information, such as his tax returns, bank statements,

---

[11]Williams affirmed that his home computer contained all the copyrighted Philips service
manuals and related information, including Philips' Tech Tips database.  *See* Tr. at 242-43.  This
admission establishes that Williams had these Philips documents on his personal home computer
as well as his BCT laptop.

divorce decree, family members' social security numbers, and so forth. *See* Tr. at 241. Also within that folder were documents such as Tech Tips from ADAC, the TAC database, information on Forte (the Philips/ADAC camera), and information on SKYLight. *See* Tr. at 243.

Williams testified that he deleted his personal files even though he knew that what would be done with his laptop when he sent it in was a keyword search to look for information relevant to this lawsuit. *See* Tr. at 244. At the Hearing, when read the statement from his Declaration suggesting that he deleted the entire My Documents file, Williams clarified that he did not delete the My Documents file at the file level, but instead he went into the folder, "selected all" the documents, then went through each document, one by one, and deselected documents he did not want to delete. *See* Tr. at 249, 250. Williams testified that he deselected and "picked out the stuff that I use for work to leave on there." Tr. at 244. Williams testified that after he deleted the documents, he ran the AbsoluteShield File Shredder program (hereafter "AbsoluteShield"), ensuring that the information he deleted was shredded and gone forever. *See* Tr. at 244, 246, 247. Williams testified that he had recently given BCT another copy of his My Documents folder on his desktop, so everything he deleted could be reviewed by Philips. *See* Tr. at 247-48.

Williams testified that he did not know he had deleted some work files until BCT received Norberg's report. *See* Tr. at 250. Regarding his Declaration, Williams admitted that he had no idea to whom or what "they" referred in the sentence, quoted above, that declared "they have no knowledge of their contents beyond this." Tr. at 255. Williams admitted that he did not have personal knowledge of the statement in his Declaration that the "add" files were temporary internet files, but that he had been told that by BCT's attorney. *See* Tr. at 253-54.

Williams initially testified that the information he deleted was available on BCT's server. *See* Tr. at 260. However, when questioned more about that assertion, Williams admitted that he really had no idea whether it was all on BCT's server. *See* Tr. at 261.

Williams testified that he had no reason to disagree with Norberg's findings that there were 97,000 files deleted from his My Documents file, and that 41,000 were lost files covered up by AbsoluteShield. *See* Tr. at 257. Williams testified that he deleted all the files at issue on September 24, 2009, right before he sent his laptop to Salt Lake City to be imaged. *See* Tr. at 258.

Williams testified that, in deleting the 160,000 files or so from his BCT laptop and then in using AbsoluteShield, it was not his intent to prevent Philips from discovering business-related documents that had been on his BCT laptop; instead it was his intent to protect his personal data. *See* Tr. at 262, 275. Williams testified that he was never told by anyone at BCT to delete files from or hide files on his BCT laptop. *See* Tr. at 276.

As with the other laptops discussed, Norberg analyzed the information from Williams' BCT laptop given to him by Lighthouse. Norberg's analysis of Williams' BCT laptop revealed that on September 24, 2009, two days after the court ordered BCT to provide access to its ESI (and within two hours of the last shutdown of Williams' computer before the court-ordered collection, which began on September 25, 2009), Williams deleted many thousands of files from his laptop. (Doc. 140, Norberg Dec., ¶¶ 12-13, Exs. 6-11.) Norberg's examination revealed that during the afternoon of September 24, 2009, Williams deleted a folder entitled "Jerry'sbackup"

containing approximately 97,000 files, plus another folder entitled "New Volume (E)" containing

approximately 29,000 additional files.  (Doc. 140, Norberg Dec., ¶ 12, Exs. 6, 9.)

        Further, Norberg found a substantial number of additional files deleted by Williams.

(Doc. 140, Norberg Dec., ¶¶ 12-13, Ex. 7-8, 10-11.)  In some instances, the files Williams

deleted exist elsewhere on Williams's hard drive and thus were duplicates (Doc. 140, Norberg,

Dec. ¶ 13); however, a massive number of files Williams deleted on September 24, 2009, were

forever destroyed (*see, e.g.*, Doc. 140, Norberg Dec., ¶ 13, Ex. 10).  Some of the files deleted on

September 24, 2009, included in Norberg's voluminous lists of deleted files (including Power

Point, Word, Excel, and PDF files) that Williams permanently destroyed on September 24, 2009,

include (just by way of example): (1) a folder named "software 1 " containing multiple subfolders

titled, for example, "AutoQUANT Ver 5.1 sft, comp w-peg 4.2 and 5.0 PN-9104-0047G RevA,"

"AutoSPECT Plus Vcr. 5.0 compatible with Peg. Ultra Vcr. 4.2 or later PN 9104-0078A, Rev

A," and "Pegasys Ultra Sft. Ver. 4.2 for Peg Ultra, Ultra 60 sys. -PN 9104-0023D" (Philips'

copyright infringement claim directly concerns the AutoSPECT, AutoQUANT and Pegasys

software.  (Doc. 140, Norberg Dec., ¶ 13, Ex. 10); (2) a folder named "philips dvd" containing

compact disk images, including files titled "PMS_ACADEMY _ED1_.MDS" (Philips has

represented to the court that it conducts its technical training at its Healthcare Academy in

Cleveland, Ohio); and (3) many hundreds of files whose file names indicate technical materials,

training and service manuals, memos, schematics, interconnect drawings and other confidential

materials created by Philips/ADAC relating to Philips/ADAC's nuclear medicine systems,

workstations and software products, including, but not limited to, JETStream, Vertex, Atlas,

Forte, Cardio MD, Solus, AutoQUANT, AutoSPECT, Pegasys, and Skylight. (*Id.*) In addition, Williams deleted entire folders of files entitled, for example: (1) "Tech tips," (2) "Pegasys," (3) "Adac Manuals," and (4) "tacdb." (*See id.*) As discussed above, Philips/ADAC's "Tech Tips" constitute one category of trade secrets Philips claims BCT misappropriated, while Philips/ADAC's "TAC" database is another. TAC was a set of tools developed by ADAC designed and deployed to increase field service efficiency and reduce service costs. The TAC database allowed Philips/ADAC engineers to, among other things, review open service calls, resolve or "close" those calls, and access customer details.

Finally, Norberg's analysis revealed that Williams downloaded, used, and then uninstalled (within the last hour of his computer's operation on September 24, 2009) the AbsoluteShield file wiping program in a conscious attempt at precluding forensic recovery of destroyed files. (Doc. 140, Norberg Dec., ¶¶ 14-16, Exs. 12-13.) AbsoluteShield operates differently than the Cipher, used by Albuquerque. (Doc. 140, Norberg Dec., ¶ 16.) While Cipher wipes the unallocated portion of a computer's hard drive, it does not affect the deleted file names. (*Id.*) AbsoluteShield, on the other hand, overwrites the content of specifically selected files or folders and also eliminates file names by changing the names to alpha numeric sequences. (Doc. 140, Norberg Dec., ¶ 16, Ex. 13.) Specifically, once a file is shredded by AbsoluteShield, the name of the file is changed and it is given a ".tmp" extension. *See* Tr. at 418-21. This process prevents a forensic expert like Norberg from determining the name of the file that was actually shredded. *See id.*

Despite the use of AbsoluteShield, Norberg was able to identify files shredded by use of the program. Exhibit 7 to Norberg's Declaration is a list of more than 3,000 files whose content and names were destroyed consistent with the use of AbsoluteShield. *See* Tr. at 418-21; Doc. 140, Norberg Dec., ¶ 16, Ex. 13. Norberg was able to determine the path for some of these shredded folders and was able to determine that they came from subfolders labeled, for example, 7.5.1 Forte software, Atlas MCD, utility disc, Software/Tech Tips/Gearbox, and so on, thereby indicating that the shredded files were not personal files, but rather work files relevant to this case.[12] *See id.*

Norberg also testified that, although he did not have time to do a thorough review of BCT's replacement hard drive, Norberg did confirm that some of the files destroyed by Williams were not included in the replacement drive. *See* Tr. at 424. For example, Norberg determined that the "Backup DT" folder Williams deleted was not on the hard drive subsequently provided by BCT. *See* Tr. at 425-27; Ex. 70. In addition, the Software 1 folders on the replacement drive do not contain the same number of files as any of the three Software 1 folders that were deleted from Williams' BCT laptop computer.[13] *See* Tr. at 428-29.

---

[12]The names of these subfolders casts doubt on the credibility of Williams' statement in his Declaration that he used AbsoluteShield to preserve the privacy of his personal files, *see* Ex. 55 at ¶21, because he used the program to shred files related to Philips/ADAC, *see* Tr. at 418-21, 423.

[13]At the Hearing, Williams admitted that he had no idea whether the Software 1 folders that he deleted from his computer are duplicated on the BCT server. *See* Tr. at 261. Philips has asserted to this court that if those folders were duplicated, BCT has failed to produce them in response to Philips' discovery requests.

As part of BCT's response to Philips' first motions for sanctions for spoliation and contempt, BCT submitted Williams' Declaration. *See* Ex. 55. The evidence presented at the hearing calls into question or directly refutes several statements in Williams' Declaration, casting doubt on the truth of those statements. First, in his Declaration Williams claimed that he deleted the "My Documents" directory and folder from his computer, believing that he "was removing only my personal data from the computer." Ex. 55, at ¶ 16.[14] Second, in his Declaration Williams stated that the list of the thousands of files identified in Exhibit 6 to Norberg's Declaration consisted entirely of personal information that had no relationship whatsoever to Philips. *See* Ex. 55 at ¶ 18.a. These statements are not consistent with the evidence presented by Norberg. Norberg demonstrated that, among the files listed on Exhibit 6 to his Declaration, were subfolders labeled Nuclear Stuff, ADAC manuals, Jetstream workstation, CardioMD documents, CardioMD software, Forte, Atlas, etc., together with many more relevant subfolders. (Doc. 140, Norberg Dec., Ex. 6.) Based on his review, Norberg testified that the files listed in Exhibit 6 to Norberg's Declaration "certainly do not appear to be limited to personal files having nothing to do with Mr. Williams' work or Philips and ADAC." Tr. at 416.[15]

---

[14]The court notes that Williams knew his computer would only be examined by means of a word search for Philips-related information in order to protect his personal information. *See* Tr. at 240.

[15]The court also notes that if Williams was just worried about his personal information, he had no reason to shred all of the Philips-related files to which Norberg testified were shredded from Williams' BCT laptop, as discussed above.

Third, Williams affirmed in his Declaration that the long list of files identified in Exhibit 7 to Norberg's Declaration "seems to contain predominantly windows temporary files" which he believed consisted of "information downloaded from internet sites." *See* Ex. 55 at ¶ 18.b. At the Hearing, Williams admitted this was something BCT's counsel told him and that he personally did not know if the files were temporary internet files. *See* Tr. at 254.

Fourth, Williams stated in his Declaration that "the data list on Exhibit 8 [of Norberg's Declaration] consisted of operating programs for various nuclear medical devices manufactured by Philips and others which was inadvertently deleted along with my personal files." Ex. 55 at ¶ 18.c. This statement lacks credibility for at least a couple of reasons. One, the names of the files deleted indicate that thousands of these files contain Philips technical data and it is simply not credible that so many files could have been deleted inadvertently. (Doc. 140, Norberg Dec., Ex. 8.) In fact, at the Hearing, Williams himself admitted that he deleted Philips Tech Tips files, Pegasys, and Software and Forte files. *See* Tr. at 255-56. Two, the fact that the deletions were intentional, and not inadvertent, is evidenced by Williams' deletion of all three of the Software 1 folders that were on his BCT computer. *See* Tr. at 403-04, 407-08. Specifically, Williams deleted a Software 1 folder from the "Jerry's Backup parent folder," a Software 1 folder from his New Volume E folder, and the third Software 1 folder from the "My Documents/ADAC folder." *See* Tr. at 407. Norberg testified that these files were selectively chosen for deletion because to delete the last Software 1 folder, Williams had to first open the My Documents folder, then open the ADAC subfolder and then locate the Software 1 folder and then delete only that folder. *See* Tr. at 408. This deletion of the "Software1" file in three different places reveals a deliberate,

44

methodical attempt to eliminate that Philips information, and casts even more doubt on the credibility of Williams' statement in his Declaration that he thought he was only removing his personal data and that the deletion of any Philips-related data was inadvertent. Fifth, the required deliberateness to delete these three files also undermines the credibility of Williams' assertion that he was "not aware" that he had deleted the Software 1 folder three times. *See* Tr. at 256.

Sixth, Williams testified in his Declaration that Exhibit 9 to Norberg's Declaration included back-up copies of files created during his employment at GE. *See* Ex. 55 at ¶ 18.d. This statement is incomplete and misleading because Norberg's Exhibit 9 also lists Philips' proprietary and confidential documents, including the TAC database and Tech Tips, which Williams also deleted from his BCT computer. (Doc. 140, Norberg's Dec., Ex. 9; Tr. at 417-18.)

Seventh and finally, Norberg was able to forensically establish that Williams' "Philips DVD" folder was not empty before Williams deleted it, contradicting Williams' apparently false statement in his Declaration that the "Philips DVD" folder on his computer was empty. *See* Tr. at 409-11; Doc. 140, Norberg's Dec., Ex. 11; Ex. 55 at ¶ 19. Norberg determined that this folder contained seven files, yet the Philips DVD folder that was subsequently provided to Philips as a replacement to the deleted ESI was empty. *See* Ex. 55 at ¶ 19; Ex. 70; Tr. at 427-29. Of course, because of his use of AbsoluteShield, the "Philips DVD" folder that Williams deleted from his BCT laptop is permanently destroyed. *See* Tr. at 410-11; Doc. 140, Norberg Dec., Ex. 11.

The combination of Williams' use of AbsoluteShield to permanently delete several thousand files, the required deliberateness to delete some of these files, and Williams' apparent lack of credibility (including Williams' admission that not all statements in his Declaration were

his own or even supported by his knowledge) indicates that Williams intentionally destroyed documents and then intentionally sought to hide those deletions. *See* Ex. 62 at ¶¶ 14-16; Ex. 69; Tr. at 401.

Furthermore, the evidence supports that many of the documents that appear to have been intentionally destroyed were relevant to this case. Norberg determined that Williams deleted more than 100,000 files from his BCT laptop, and that more than 3,000 of those deleted files were permanently destroyed; Hooper (BCT's expert) confirmed that this number is accurate. *See* Ex. 62 at ¶ 16; Tr. at 412, 462. Norberg testified that it is not possible to recover any of the files shredded by AbsoluteShield, *see* Tr. at 423; however, as set forth above, Norberg was able to determine the path of some of these documents and was able to identify the labels of the subfolders from which they came. *See, e.g.,* Tr. at 418-21. Again as set forth above, the names of many of those subfolders strongly indicate that the deleted files were relevant to this lawsuit. Thus, the apparent intentional deletion and destruction of files from Williams' laptop once again precludes Philips from discovering the contents of deleted electronic files (and in the case of Williams' laptop, even the names of the file).

### *4. Carter*

Marcus Carter is a field service engineer for BCT nuclear medicine camera systems, and, like Gasparovich, Albuquerque, and Williams, is a former employee of Philips/ADAC. *See* Tr. at 278-79. As with the others, Carter agreed to terms of confidentiality in consideration of his employment by Philips. Carter's agreement included:

> Not to use, publish or otherwise disclose (except as my job requires) either during or after my employment, any secret or confidential (proprietary) information or data of the company of its customers or any other third party received by the company in confidence.
>
> Upon the termination of my employment, to deliver promptly to the company all written and other materials that relate to the business of the company or its affiliates.

(Doc. 139, Kindley Dec., ¶ 12, Ex. N.)  Tr. at 280; Ex. 60.

Carter testified that he became aware of this lawsuit in approximately April or May 2009, when William Biddle, BCT's Chief Operating Officer, said something about it.  *See* Tr. at 282. Before that time, Carter had not received any information about the lawsuit and had not been told that he needed to preserve information and not delete any relevant materials from his laptop.  *See* Tr. at 283.  Carter testified that up until he received the email in August 2009, no one from BCT's management had explained to him in any way the claims involved in this case.  *See* Tr. at 284.  Carter testified that, other than asking him for his BCT laptop, no one from BCT had ever asked him to provide information for production to Philips in this case.  *See* Tr. at 284-85.  Carter testified that he did not participate in a telephone conversation regarding the issue of sending in his laptop.  *See* Tr. at 286.

Carter's sworn Declaration states that before turning over his BCT laptop, he deleted five files containing copies of his personal pay stubs.  *See* Tr. at 287-88; Ex. 53.  Carter's Declaration also states that he deleted a folder containing the program Image Burn.  *See* Tr. at 289.  Carter's Declaration explains that Image Burn is a program that copies CDs and DVDS.  *See* Tr. at 289; Ex. 53.

Carter testified that he only deleted personal files from his BCT laptop, including five files containing his personal pay stubs, a file containing an Image Burn program, and a file containing data from a Solaris 2.5.1 CD. *See* Tr. at 287-94. Carter's testimony reaffirmed what he said in his Declaration that these were the only files he deleted and that, "No information relating to any of the named Plaintiffs in this action was contained in any of the [deleted] files." Ex. 53 at ¶¶ 9-13. At the Hearing, Carter repeatedly testified that he only deleted files with personal information from his computer. Carter testified, "As I recall, files I deleted were just personal information," Tr. at 289, and again, "To my knowledge, no. All I was removing was personal information that was non-company information and not related to this case" Tr. at 292. Carter testified that based on his recollection, he only deleted the five pay stub files, the Solaris file, and the Image Burn files, and he provided copies of these files to Philips; thus, Carter claimed that he provided Philips with copies of everything he deleted. *See* Tr. at 295-96.

Carter testified that he read the June 2009 email telling BCT employees not to delete anything relevant to the lawsuit. *See* Tr. at 297-98. Carter testified that he was never told by anyone at BCT to delete files from his laptop in order to hide Philips documents. *See* Tr. at 298.

Lighthouse captured a forensic image of Carter's BCT laptop's hard drive on September 26, 2009. (Doc. 140, Norberg Dec., ¶ 11.) As with the other laptops, Norberg examined that forensic image. Norberg discovered that on September 24, 2009, Carter deleted five PDF files, as well as a CD image file from his recycler folder. (Doc. 140, Norberg Dec., ¶ 11, Ex. 5.) The deleted files were not overwritten, but four of the PDF files were password protected and the fifth was corrupted. (*Id.*)

Further, Norberg discovered that a folder called "Marcus" was deleted. *See* Tr. at 432. Within "Marcus" were approximately 20,000 files and folders. Included in those 20,000 files were folders entitled "Siemens" and "ADAC." *See* Tr. at 432. The ADAC folder contained approximately 6,900 files and the Siemens folder contained approximately 9,100 files. In the ADAC folder were subfolders called ADAC parts book, Atlas, Atlas Ultra, Cardio MD Class Docs, Cardio MD 1.8, Cardio MD 1.8.1, Cardio MD 2.0, Forte, Forte Data, Forte Information, Forte Documents, Jetstream AC Detector, Genesys, among many others. *See* Tr. at 435-36. Norberg testified that none of the files deleted from the Marcus folder were provided to him on the replacement disk (purporting to contain everything Carter deleted) BCT gave him.

Norberg's findings regarding Carter's deletions of the Marcus folder were not in his original Declaration in December, but were included in his January 2010 Expert Report. *See* Tr. at 433. Norberg testified that he did not have enough time to gather all the information until January, and that is why everything he discovered about Carter's deletions were not included within his earlier Declaration. *See* Tr. at 433-34. Carter admitted in his testimony at the Hearing to the deletions that were documented in Norberg's Declaration, but denied any additional deletions that were set forth in the Expert Report later sent to BCT, which report Carter had not seen. *See* Tr. at 434.[16]

Carter's credibility is called into question by several factors in this case. First, the evidence contradicts his testimony. Norberg testified that Carter deleted thousands of files in

---

[16]Notably, under the Protective Order, Norberg's Expert Report (as opposed to his Declaration) is for Attorneys' Eyes Only. (Ex. 61.)

addition to his personal files.  Those additional files appear to have been Philips files, as well as files regarding Siemens, another competitor of BCT.  The deleted files had a folder labeled "ADAC" that contained 6,900 files, as well as a folder labeled "Siemens" that contained 9,100 files.  *See* Tr. at 432-33.  Based on the names of the subfolders contained within the ADAC folder, it appears that many of the deleted folders included ESI relevant to this case.

Second, Carter's lack of credibility is demonstrated by the fact that he only confessed to deleting the files initially identified by Norberg in Norberg's Declaration.  *See* Ex. 62 at ¶ 11.  Carter then repeatedly testified, as discussed above, that he only deleted personal files.  Despite repeated opportunities provided to him to truthfully testify under oath, Carter never mentioned the 20,000 additional business files that he also deleted.  As Norberg testified, Carter only admitted to what was in Norberg's declaration filed in December; he did not admit to any of the deletions documented in Norberg's expert report, which Carter had not seen.  *See* Tr. at 434.

Third, Carter initially testified that he did not maintain "any folders of Philips information on [his] BC Technical computer," Tr. at 281; however, he later testified that he did have an ADAC folder on his BCT computer that contained ADAC service manuals, calibration procedures, and other technical data related to Philips/ADAC cameras.  *See* Tr. at 281.  He also admitted that he acquired all of this information from BCT.  *See id.*

### *5. Sokolowski*

Edward Sokolowski is BCT's Regional Service Manager (North East) and is the Director of  Positron Emission Tomography (hereafter "PET"),  providing BCT National Support for PET products.  (Doc. 179, Graff Dec., Ex. A.)  Sokolowski used to work for UGM Medical Systems

(hereafter "UGM"), which was acquired by ADAC Laboratories (hereafter "ADAC") in 1999. (Doc. 179, Graff Dec., Ex. A, at 7:11-8:22.) ADAC was then acquired by Philips in 2000. After UGM's acquisition by ADAC, Sokolowski continued to work for ADAC and then Philips until 2005, at which point he was hired by BCT. (*Id.* at 8:17-10:11.) As with Gasparovich, Albuquerque, Williams, and Carter, Sokolowski similarly agreed to terms of confidentiality during his employment with Philips/ADAC. (Doc. 179, Graff Dec., Ex. B.)

Sokolowski was deposed in connection with this litigation on November 20, 2009. (Doc. 179, Graff Dec., Ex. A.) During his deposition, Sokolowski testified under oath that he had not deleted information from his computer. When asked specifically if he had deleted files from his computer after learning his computer was going to be examined, he again denied it. (Doc. 179, Graff Dec., Ex. A, at 47:21-49:9.)

In preparing for the Hearing, Norberg, Philips' computer forensics expert, uncovered deletions from Sokolowski's BCT laptop. Norberg's examination of Sokolowski's computer data revealed that Sokolowski's BCT computer was loaded with many Philips/ADAC-originated files, as demonstrated not only by file names, but also by the files' metadata. (Doc. 176, Norberg Dec., ¶ 12, Ex. 8.) Norberg identified at least 324 files from Sokolowski's computer, for which the metadata identifies the originating "company name" as Philips or ADAC. (*Id.*) All 324 of these files were deleted from Sokolowski's computer. (*Id.*) Metadata is unavailable for numerous additional files that were deleted and overwritten. (*Id.*)

According to Norberg, starting on August 24, 2009, and continuing through September 23, 2009, approximately 15,000 files and folders were deleted from Sokolowski's hard drive.

(Doc. 176, Norberg Dec., ¶ 7, Ex. 1.)  On August 24, 2009, a folder titled "UGM-PMS" was deleted from Sokolowski's computer.  (*Id.*)

The "UGM-PMS" folder deleted from Sokolowski's computer on August 24, 2009, contained 10,875 files and subfolders, all of which were deleted.  (Doc. 176, Norberg Dec., ¶ 8, Ex. 2.)  Four deleted subfolders contained within the "UGM-PMS" folder were titled "Philips Info," another folder was titled "Philips," and five additional folders were titled "Tech Tips." (Doc. 176, Norberg Dec., ¶ 8, Exs. 3-4.)

In addition, on the evening of September 22, 2009, approximately 3,480 files and folders were deleted from Sokolowski's computer through the recycler folder between 7:15 P.M. and 9:23 P.M. (EDT).  (Doc. 176, Norberg Dec., ¶ 9.)  These deletions also included folders entitled, among other things, "Tech Tips" and "Philips."  (Doc. 176, Norberg Dec., ¶ 9, Exs. 5-6.)

Finally, on September 23, 2009, additional deletions occurred between 6:40 A.M. and 10:04 A.M. (EDT).  (Doc. 176, Norberg Dec., ¶ 10.)  Approximately 1,130 additional files and folders were deleted from Sokolowski's computer through the recycler folder.  (Doc. 176, Norberg Dec., ¶ 10, Ex. 7.)  Sokolowski's computer was last used prior to the imaging process during the morning of September 24, 2009.  (Doc. 176, Norberg Dec., ¶ 6.)  Lighthouse imaged Sokolowski's computer hard drive on September 24, 2009.  (*Id.*)

According to Hooper, BCT's own expert, only 4,500 of the 15,000 files deleted by Sokolowski are recoverable.  (Doc. 176 (Norberg Dec.), at ¶ 7; Doc. 194-7 (Hooper Dec.) at ¶¶ 6-7.)  Thus, approximately 10,500 of the files were permanently destroyed by Sokolowski. *See id.*

As part of BCT's response to Philips' second motion for spoliation sanctions and for order finding contempt of court, BCT issued Sokolowski's sworn Declaration. (Doc. 194-5.) The Declaration is incomplete. BCT did not fill in the blank as to what file folder Sokolowski deleted. Further, as set forth above, both Norberg and Hooper agree that Sokolowski deleted not one folder, but multiple folders; however, when Philips notified BCT of its error and omission regarding the unidentified deleted file folder, BCT did not respond. BCT did not issue a supplemental declaration or an errata. BCT simply did not respond.

Having examined the testimonies of the employees who used the five BCT laptops upon which Philips, in part, relies in bringing its current motions, the court next examines the testimonies of Biddle and Hale, who also testified at the Hearing.

### 6. *Biddle*

As the Chief Operating Officer, William Biddle handles all the day-to-day operations of BCT. *See* Tr. at 90-91. As the COO, Biddle was designated by BCT as their Rule 30(b)(6) witness with the most knowledge of BCT's computer system, and was deposed as such. *See* Fed. R. Civ. P. 30(b)(6). Biddle's deposition was taken on June 23, 2009. *See* Tr. at 98-99.

The evening after his deposition, Biddle sent his June 23, 2009 email to "all employees," over one hundred employees. *See* Tr. at 93-94, 100. Biddle testified that he had not sent out any emails before the June 23, 2009 email to "all employees" that told the employees not to delete ESI. *See* Tr. at 101. The June 23 email stated, in full:

53

Folks–

    This is a reminder that you are to save any electronic records that could possibly be associated in any way to the Philips litigation.  If there is any question in your mine [sic] then make sure to retain the information.

    Feel free to give your respected manager a call if you would like to discuss.

(Doc. 194, Ex. 1.)

Biddle testified that, prior to the June 23 email, preserving information on BCT computers had been discussed with management staff in conference calls.  *See* Tr. at 101, 120.  Biddle testified that the reference to a "reminder" in this email was referring to those conversations he had had with management staff on conference calls.  Biddle said that he had asked the management staff to relay that information to their employees.[17]  *See* Tr. at 120.

Biddle testified that on August 25, 2009, he sent out the second email, containing the Litigation Hold Memo, to "all employees."  *See* Tr. at 93-94, 104.  In the heading of that email is a reference that the email was of "high" importance.  Biddle testified that such a reference meant "it's a very important email, please read it."  Tr. at 121.  Biddle testified that he personally did not read the Litigation Hold Memo in detail, but only skimmed it.  *See* Tr. at 105, 107.  When asked if he expected his employees to read it in detail or to simply skim or scantily read it, Biddle said that he expected them to read it.  *See* Tr. at 105.

Biddle testified that he was responsible for gathering up the documents to produce to Philips in this case.  *See* Tr. at 102.  He testified that he did not talk individually with any of the

---

[17]The court notes that none of the executives who testified at the Hearing mentioned that they had been included in these conversations with Biddle.

BCT employees whose laptops are now at issue to ask them to produce information that they had responsive to Philips' requests. Biddle testified that he could not recall whether he sent an email to either Albuquerque or Gasparovich asking for documents that were responsive to Philips' discovery requests. Biddle testified that he did not send an email to Carter or Williams. He testified that he did send such an email to Sokolowski, but he could not remember whether Sokolowski ever responded and produced anything. *See* Tr. at 103-04. Biddle testified that to his knowledge, prior to October 2009, no one at BCT had told Albuquerque that his BCT laptop would be sent in. *See* Tr. at 117-18.

Biddle testified that he participated in the September 24, 2009 conference call with out-of-state employees. *See* Tr. at 95-96. Biddle testified that the September 24 conference call was held because some employees who had been asked to send in their laptops for imaging were upset and concerned about personal and private information, such as bank statements, check stubs, passwords, and account codes that were on their BCT laptops. *See* Tr. at 122-23, 126. Biddle could not remember everyone who participated in that call, but he did remember that Williams, Sokolowski, Hale, Carter, Paul Schenker and Derek Tolboe participated and that Albuquerque did not participate in that call. *See* Tr. at 122-23, 125. During that call, Biddle told them that they were not to remove personal information from their computers. *See* Tr. at 123. Biddle testified that he told them that any personal information on their computers would be kept strictly confidential. *See* Tr. at 125.

When asked whether he had made an attempt to preserve the information listed in the Litigation Hold Memo within BCT, Biddle said, "We made every attempt to preserve everything

55

we had." Tr. at 108. When it was pointed out that the list of things to be preserved listed in the

Litigation Hold Memo was not distributed until August 25, 2009, Biddle responded, "Most of

that stuff is on our server." Tr. at 108. Biddle testified that until August 18, 2009, when this

court ordered that BCT backup tapes be preserved, BCT backup tapes were routinely overwritten

on a rotating basis. *See* Tr. at 118-19.

Biddle testified that he read his sworn Declaration, which he signed on August 17, 2009,

and which was then filed with the court. *See* Tr. at 109; Ex. 44. His Declaration states:

"Pursuant to Philips' discovery request in this action, BC Tech has already: (1) had its employees

search their own computers, e-mail, and user files; and (2) had its in-house information

technology (IT) staff, search its servers, e-mail, and user files using the relevant keywords

'Philips' and 'ADAC.' BCT's production, IT, and sales staff have also performed follow-up

searches to make sure that no relevant documents have been missed." *See* Tr. at 110-11; Ex. 44.

At the Hearing, Biddle denied that BCT had ever found any relevant documents that were

missed. *See* Tr. at 111.

Philips' counsel presented Biddle with an email from Sokolowski to Gasparovich and

others. *See* Tr. at 112; Ex. 16. Attached to that email was the C-PET de-install manual

Sokolowski and others created just before Sokolowski left Philips. *See* Tr. at 112; Ex. 17. That

document is marked as a confidential Philips document. *See* Tr. at 113; Ex. 17. That document

also states, "This document and the information contained in it is proprietary and confidential

information of Philips Medical Systems, Philips, and may not be reproduced, disclosed to others,

or disseminated without the prior written permission of the Philips legal department." Tr. at 114;

Ex. 17. Philips' counsel represented to the court that this document was one example of documents that Philips had obtained only from the information Lighthouse gathered from imaging BCT computers. Philips' counsel represented to the court that Philips had never received this document directly from BCT. *See* Tr. at 112.

As with several other BCT witnesses, the credibility of Biddle's testimony and Declaration is suspect because of the evidence presented in this case. The evidence presented calls into question the veracity of Biddle's statement in his Declaration that BCT "had its employees search their own computers, e-mail, and user files," because the witnesses testified that they were not asked for information, were not informed about the case, and did not read the two emails that discussed the need to preserve evidence in this case. As such, Biddle's August 17 sworn Declaration appears to be false and meant to deceive and mislead. Second, the evidence Philips presented showing that ESI existed on BCT computers shows that either BCT had simply failed to look for relevant ESI or that BCT was hiding the ESI it had discovered.

### 7. *Hale*

Charles Hale and his wife are the original founders and were the principal owners of BCT. *See* Tr. at 127-28. Up until the sale of BCT to MSouth in July 2009, Hale was President and Chief Executive Officer of BCT. *See* Tr. at 128. Hale is now BCT's Chief Executive Transition Officer (hereafter "CETO"). *See* Tr. at 128. Before founding BCT, Hale worked for ADAC. *See* Tr. at 128.

Hale testified that while working at ADAC, he signed an ADAC confidentiality agreement. *See* Tr. at 129; Ex. 76. Hale testified that sometime after January 2005, when a

Philips employee left Philips to work at BCT, he started receiving a letter from Philips' counsel regarding that new BCT employee, and attached to that letter was a confidential agreement that the employee had signed with Philips/ADAC.  *See* Tr. at 134.

Hale testified in his deposition that he had never tried to buy any competitor's confidential information and that it would be wrong to do such a thing.  *See* Tr. at 201-02.  At the Hearing, Hale again said he had never tried to buy a competitor's confidential information.  *See* Tr. at 202.  However, at the Hearing, Philips' counsel presented an email chain between Hale and Scott Dorchin from September 2009.  *See* Tr. at 202; Ex. 30.  In that email chain, Hale tells Dorchin that he would be willing to pay someone for information relating to how Philips was locking people out of the system with the Smart Card, what they are locked out of, all the products that they are locked out of, and what Philips' corporate offices and customers were saying about BCT .  *See* Tr. at 203; Ex. 30.  Hale acknowledged that those emails occurred the same month that the BCT laptops were turned over to Lighthouse for imaging.  *See* Tr. at 202.

In addition, Philips' counsel presented another email thread between Hale and Michael Batten that occurred from September 6, 2006, to October 24, 2006.  *See* Tr. at 205-07; Ex. 32.  Copies of that 2006 email thread were sent to Gasparovich and Kent Cottle.  *See* Tr. at 206; Ex. 32.  That email thread reveals a discussion about Hale purchasing Siemens' contract database from a Siemens employee who was getting ready to leave Siemens.[18]  Hale was told that the Siemens employee was "looking to make some money before he le[ft Siemens]" and was

---

[18]Siemens is a competitor of Philips and BCT.  *See* Tr. at 206.

downloading other kinds of information. *See* Tr. at 206. As the emails continue, among other things, a specific price is mentioned and Batten asks Hale (and Gasparovich) how much they are willing to pay for the Siemens U.S. nuclear medicine contract database. *See* Tr. at 207.

After being presented with the two email threads, Hale admitted that when he testified that he had never tried to buy any competitor's confidential information that he was not giving an accurate statement. *See* Tr. at 207-08.

Hale testified that after this lawsuit was filed, he told Biddle, BCT's COO, that the company should not delete anything relevant to this lawsuit, *see* Tr. at 141-42; however, Hale also testified that he could not remember whether he told Biddle not to delete anything, *see* Tr. at 142. Hale testified that he could not remember whether he told Biddle what Biddle needed to do to make sure that nothing was deleted, and he did not follow up with Biddle to find out what measures had been taken to preserve information. *See* Tr. at 142. Hale testified that he was certain that the two emails were sent out to all BCT employees in June 2009 and then in August 2009. *See* Tr. at 142-43. Hale testified that he could not recall whether notice went out to employees that they should not delete anything relevant to the lawsuit between January 2008, when the lawsuit was filed, and June 2009, when the first email was sent.

Hale testified that at the Fourth Annual BCT National Conference, which occurred on April 25, 2009, which the majority of BCT field service engineers attended, Hale gave a power point presentation. *See* Tr. at 144-45. Included in that presentation was an update on this lawsuit. *See* Tr. at 145. Hale testified that nowhere in the bullet points did he tell employees not to delete anything and to preserve information relevant to this lawsuit. *See* Tr. at 145. The presentation

informed employees that Philips had requested BCT to produce certain information related to a number of employees, including Sokolowski, Williams, Gasparovich, Albuquerque, and Carter. *See* Tr. at 145. Hale testified that he did not take any steps at that time to ensure that these employees preserved information on their laptops that might be relevant to this lawsuit. *See* Tr. at 146-47. Hale testified that, until the August 25, 2009 email attaching the Litigation Hold Memo was sent, no written notification was sent to BCT employees informing them of the sort of information that would be relevant to this lawsuit. *See* Tr. at 148-49.

Hale testified that the BCT laptops that were sent to Lighthouse, as well as all the information on those laptops, are BCT property. *See* Tr. at 151. Hale testified that according to BCT's policies and procedures, BCT retains the right to search computer files, and computers any time it wants. *See* Tr. at 151; Ex. 22.

Hale testified that in 2004 or 2005 he told BCT employees not to use the TAC database and to remove it from their computers. *See* Tr. at 152-55.

In his deposition, Hale insisted that "[n]othing was destroyed" at BCT relevant to the litigation, including that nothing was deleted from BCT computers. *See* Tr. at 209-210. At the Hearing Hale was asked whether, since learning that files were deleted from employees' computers, he had checked with any other BCT employees to see if they had deleted anything from their BCT computers. *See* Tr. at 210. Hale responded that that "would be a Bill Biddle question" and that Hale had not made such an inquiry. *See* Tr. at 210.

At the Hearing, on direct examination, Hale testified that before the June 2009 email was sent, he had talked to BCT employees concerning the preservation of information related to this

lawsuit. When asked on cross-examination specifically which employees he had spoken to, Hale testified that he knew he had talked to Derek Tolboe and Biddle, and he was not sure "who else was around" – that those were the two main people that were controlling. *See* Tr. at 215. Hale testified that at that time, BCT had approximately 110 employees. *See* Tr. at 216.

Hale testified, "I feel very strongly that we never used [Philips'] confidential information."[19] Tr. at 138. This assertion, made under oath, is not supported by the evidence. For example, Exhibit 17 is a copy of a proprietary Philips C-Pet De-Installation Technical Manual (every page of which is labeled "confidential and proprietary"), which BCT had in its possession. *See* Ex. 17. Moreover, Sokolowski states in an email that this manual is something "we created just before I left Philips," and it appears from this email that BCT used this manual to perform an upcoming "de-install and move" of a Philips medical system. Ex. 16. Similarly, Exhibits 5 and 6 consist of a copy of a new Philips marketing initiative and emails between BCT executives (including Hale) wherein they discuss Philips' new initiative, as well as a copy of the initiative itself. *See* Exs. 5 and 6.

Other documents also demonstrate that Hale's testimony lacks credibility. For example, Exhibit 36 is an email thread evidencing that BCT used Philips' proprietary TAC database to determine Hawaii's Philips/ADAC installed base, and Hale is copied on the relevant emails. *See* Ex. 36. Another example is Exhibit 41, which consists of an email from Rex Lindsey, BCT's

---

[19]Hale also testified that he told his management team that if they had any of Philips' confidential or proprietary information, they were not supposed to use it. *See* Tr. at 140. If he really did say this to the BCT management team, it is obvious that they utterly disregarded him, as demonstrated by the evidence cited herein.

Director of Marketing and Service Sales, to various BCT executives (including Hale), referencing an excel spread-sheet with service contract leads for nine geographical states or areas, and with lists of Philips' customer contracts in the identified areas.[20] *See* Ex. 41. Third, Exhibit 19 consists of a presentation regarding "BCT Service Sales Meeting Action Items & Assignments," wherein BCT has identified all of the Philips customer contracts that were due to expire in 2006 (which is the very type of information contained in Philips' proprietary TAC Database, as well as other databases misappropriated by BCT, as discussed in greater detail below), and the presentation goes on to state that BCT is implementing a sales effort targeting this market of expiring Philips/ADAC contracts, and that this is BCT's "#1 Priority." *See* Ex. 19, at 15, 30-34.

Hale's convoluted and contradictory testimony regarding the Philips TAC database also illustrates his lack of credibility as a witness. The TAC database, as defined by Kent Cottle, a BCT executive, is a Philips database of "parts/prices/customers/reports/open cases/all FSE's contact info etc." *See* Ex. 31; *see also* Tr. at 159-61 (explanation of TAC database). Similarly, Gasparovich testified that the TAC database is a Philips-created database that "contains a great deal of information concerning Philips/ADAC customers," as well as "a comprehensive or exhaustive list of Philips/ADAC nuclear medicine customers." Tr. at 65.

---

[20]It appears this list was compiled using Philips' proprietary customer information. The list references Philips' customer contracts. The last column of each contract identifies whether it is "Gold" or "Silver" which are terms Philips has represented to this court that it uses to distinguish the nature of its service contracts, and which are terms Philips has represented that BCT does not use. *See* Tr. at 24.

Hale testified that he instructed BCT employees not to use the TAC database and to delete and erase it from the company computers so that there was no record of it. *See* Tr. 152-55.[21] Hale testified that he gave this instruction because BCT did not "need" the TAC database, and because he wanted BCT to be "squeaky clean" and he did not want to create any problems with Philips. *See* Tr. at 159, 165. Hale also testified that BCT did not need to use the TAC database because it was outdated and inaccurate, since Philips stopped issuing the TAC database in 2000.[22] *See* Tr. at 161. Thus, Hale testified that BCT would have had no use for the TAC database. *See* Tr. at 161. Hale also indicated that, although it was labeled confidential and proprietary, he was not sure that the TAC database was, in fact, confidential. The evidence at the Hearing established that each of Hale's foregoing statements about the TAC database was false, *i.e.*, that the TAC database was confidential and proprietary to Philips, that BCT believed it was confidential and proprietary, and that BCT knew it was not supposed to have it but did use it.

Contrary to Hale's assertion that the TAC database was not confidential, when asked in his deposition to identify what Philips confidential information had been provided to BCT, the

---

[21]Hale was not sure when he gave this directive to BCT employees. He thought it may have been in 2004. *See* Tr. at 156. In 2009, however, he sent an email with the following: "do you remember when we had a meeting which we told Rex [Lindsey] and all sales to get rid of the TAC database? I remember Vince [Rampton] had advices [sic] us to get rid of it and we had that meeting and then had Mike Dennison purge it from the system. . . ." Ex. 29; *see also* Tr. at 156-58.

[22]Hale also testified that, at least by mid-2005, there would have been no reason for anyone at BCT to refer to the TAC database. *See* Tr. at 165-66.

first thing Hale mentioned was the TAC database.[23]  *See* Tr. at 163-64.  Moreover, Hale testified

that, in his conversation with Kent Cottle about the TAC database, Cottle "just remembered that

we weren't supposed to have the TAC database."  *See* Tr. at 156-57.  In fact, in a 2008 email

regarding the TAC database, Cottle stated "we are not supposed to have it, but we do . . . ."  Ex.

31.  In a September 23, 2005 email, another BCT employee, Mike Dennison, admitted that the

TAC database was "proprietary" and that BCT was purging all TAC database information from

BCT's customer accounts for those customers that were not active "for the obvious, and scary,

legal reasons."  Ex. 27.  This statement by itself shows that BCT knew that its retention and use

of this proprietary and confidential information exposed it to legal liability.  Finally, even Hale

himself admitted that the information contained in the TAC database was, in fact, Philips'

proprietary and confidential information.  *See* Tr. at 178.  Significantly, Hale also admitted that

BCT was not supposed to have the TAC database, yet "we all have electronic copies of it."  *See*

Tr. at 179.  Finally, in 2008, *three years* after it was supposedly "purged," Hale was asking for a

CD of the TAC database, which Albuquerque furnished.  *See* Tr. at 332-335; Ex. 28.

    Other evidence also arguably demonstrates that BCT used Philips' TAC database, thus

refuting the credibility, even more, of Hale's testimony "I feel very strongly that we never used

[Philips'] confidential information."  Tr. at 138.  For example, when BCT was trying to identify

the market for, and installed base of, Philips' medical systems in Hawaii, it used the TAC

database to identify how many Philips cameras were in Hawaii and which ones were under

---

[23]It was BCT's people that marked the TAC database as Attorneys' Eyes Only under the
terms of the Protective Order in this case.  *See* Tr. at 124-25.

contract with Philips.  *See* Ex. 36; Tr. at 167-68.  Significantly, Hale knew or should have known about this use of the TAC database because he was copied on the relevant emails.  *See* Tr. At 167-68.

Second, the list of Philips' contracts set forth in the Excel spreadsheets used by BCT is the very type of information which could be obtained from the TAC database.[24]  *See* Ex. 41.

In addition, on July 10, 2008, Kent Cottle sent an email to all BCT Field Service Engineers (hereafter "FSEs"), wherein he states, "we all have electronic copies of the TAC database."  Ex. 14.  Of course, the fact that all of the BCT FSEs have copies of the TAC database implies, at a minimum, that they were using it.[25]  Moreover, Kent Cottle sent this email requesting that the FSEs locate physical copies of the TAC database from 2000, 2001, 2002, 2003, etc., and he submitted this request on behalf of Hale.  *See* Ex. 14.  The fact that Hale was urgently trying to locate various annual physical versions of the TAC database in 2008 establishes that BCT had continued to use the TAC database.  Cottle's request on behalf of Hale generated many responses.[26]  *See* Exs. 28, 31, 35.  However, when Hale was asked at the Hearing

---

[24]Moreover, Hale admitted that BCT would consider this type of information about its customers to be proprietary.  *See* Tr. at 170.  This admission is yet another statement that undercuts Hale's assertion that the TAC database was not confidential or proprietary.

[25]The fact that all the BCT FSEs have electronic copies of the TAC database in 2008 further demonstrates that BCT did not comply with Hales' purported directive several years earlier that BCT delete the TAC database from its computers.  In fact, Gasparovich testified that he removed the TAC database from his laptop computer because it was on the BCT server and he could "access it through our server."  Tr. at 65-66.

[26]One BCT employee, Victor Puia, responded to Cottle's email by stating that giving a copy of the database to Cottle would be "irresponsible," because he did not trust Cottle.  *See* Ex.

65

why he was so urgently trying to locate physical copies of the TAC database, he repeatedly replied that he did not remember this and had no recollection of it.  *See* Tr. at 172-75, 184.

Fourth, the evidence also established that BCT used the TAC database to identify those Philips contracts which were about to expire so it knew which customers to target in its own sales efforts.  For example, as noted above, Exhibit 19 consists of a 2006 presentation entitled "BCT Service Sales Meeting Action Items & Assignments," wherein BCT identified all of Philips' customers whose contracts were due to expire in 2006.  *See* Ex. 19, pp. 1, 15, 30-34.  It includes maps of the United States whereon the expiring Philips contracts are pin-pointed.  *See id.*  The presentation goes on to state that BCT is implementing a sales effort targeting this market of expiring Philips/ADAC contracts, and it states that this is  BCT's "#1 Priority."  *See id.* Hale's testimony regarding this exhibit again lacks credibility.  Hale had previously testified that he did not ever see any maps of the United States, or parts thereof, wherein the expiring Philips contracts were identified, *see* Tr. at 190, yet Exhibit 19, which does exactly that, was emailed to Hale, *see* Ex. 19.

Perhaps the most damning evidence establishing Hale's testimony lacks credibility because Hale knew BCT used Philips' proprietary information (but denied it in court under oath) is the fact that BCT loaded the information from the TAC database into BCT's own customer database (which is known as the CRM database).  Hale testified that he did not know that the TAC database had been loaded into BCT's CRM database, s*ee* Tr. at 185-86; however, BCT's

---

35.  Puia, however, quickly retracted his statement when Cottle reiterated that it was Hale who was requesting the TAC database and threatened to inform Hale of Puia's response.  *See id.*

own documents establish that BCT imported the "proprietary" TAC database into BCT's CRM database, and Hale knew all about it because he issued a "direct order" to purge only those portions of the TAC database which had information about customers with whom BCT had inactive accounts and no open opportunities, *see* Ex. 27, at 2 and 3. This took place in September of 2005, which was a few months after Philips threatened to file a lawsuit against BCT if BCT did not change various business practices. *See* Exs. 14, 23 and 25; Tr. at 187-88. Dennison's email also references the fact that he was purging portions of the information in the TAC database "for the obvious, and scary, legal reasons." Ex. 14. Hale admitted at the Hearing that those "obvious and scary legal reasons" consisted of the fact that he did not want to be caught using Philips' confidential and proprietary information. *See* Tr. at 189. Thus, this evidence demonstrates Hale was aware that BCT - *as a company* - was destroying evidence it knew to be incriminating.

Another example of Hale's apparent lack of candor and honesty toward the court occurred when he was shown Exhibit 6, which, as noted above, was a new Philips Marketing Initiative which Philips undertook in August of 2006. *See* Ex. 6. Hale testified that BCT received possession of that document from a Philips salesperson.[27] His testimony on this point appears to be contradicted by Exhibit 5, which consists of an August 2006 email exchange[28]

_____

[27]Of course, even if this statement is true, it was still improper for Hale to have a copy of such a document in light of his knowledge that it was improperly obtained and the Confidentiality Agreement he had signed with Philips. *See* Ex. 76.

[28]This email exchange shows that BCT had the new Philips marketing initiative the month before the initiative was even scheduled to begin. *See* Ex. 5.

between Hale and Gasparovich, wherein Hale asks, "Can I ask where this came from?", and Gasparovich responds, "No." Ex. 5; *see also* Tr. at 200-01.

Finally, as discussed above, Hale lied about the fact that he tried to buy confidential and proprietary information about BCT's competitors when he testified in his deposition and at trial that he "never tried to buy any competitor's confidential information and that it would be wrong to do such a thing." Tr. at 201-202. In direct contradiction of this testimony, Hale was shown Exhibit 30, which consists of a September 2009 email thread (only a couple of months before Hale's deposition), wherein Hale states that he is trying to find a former Philips employee who might have knowledge about how Philips is locking people out of its medical systems with smart cards. *See* Ex. 30. Hale goes on to state that "Yes, I would pay him for information if it helps us!" *Id.* When confronted with Exhibit 30, Hale tried to explain it away by claiming that the information regarding how Philips used the smart card to lock people out of its medical systems was not proprietary and confidential and he could have obtained that information from any customer. *See* Tr. at 203-04. Hale's explanation lacks credibility because the information he is seeking is very arguably proprietary, and if this information could have been obtained by simply asking a customer, there would have been no need for Hale to find a former Philips employee and offer to pay for it. Albuquerque, who actually worked on aspects of BrightView, testified that Hale had contacted him to obtain this information and that Albuquerque could not provide him with this information because he was not involved with software development as a former Philips engineer, *see* Tr. at 337-38, but even if he had the information, he would not have

68

provided it to Hale because the information is proprietary to Philips, *see* Tr. at 338. Thus, Albuquerque's testimony directly refutes Hale's claims.

Exhibit 32 offered another example of Hale's willingness to buy confidential information about a competitor. Specifically, this exhibit consists of a series of emails to Hale about an employee who is about to leave Siemens (another BCT competitor), who wants to make some money by downloading certain Siemens information and then giving it to BCT, with the caveat that he has "to be very careful and cover his tracks." Ex. 32. Hale is informed by Michael Batten that he has negotiated the Siemens employee "down to $4,000," and he wants to know how much Hale is "willing to pay for it." *Id.*

At the Hearing, after being confronted with Exhibits 30 and 32, Hale himself admitted that he had not been truthful when he testified that he never tried to buy any competitor's confidential information:

> Q:     So when you testified in your deposition that you have never tried to buy any competitor's confidential information, that was not really an accurate statement in your deposition, was it?
> A:     Okay.
> Q:     Do you agree with that?
> A:     Yes.

Tr. at 207-08.

Of course, a critical issue in Philips' three motions currently before the court is whether BCT did, in fact, delete relevant information and data from its five laptop computers and then tried to hide it. At the Hearing, when Hale was asked whether anyone at BCT deleted relevant ESI and tried to cover that fact up, Hale adamantly responded, "No, No, No. No one did that.

69

That's what I am saying." Tr. at 209. Obviously, as the evidence at the Hearing demonstrated, BCT employees did, in fact, delete thousands of relevant electronic files from the five laptops, took deliberate steps to cover up what they had done, and then lied about it. Therefore, Hale's testimony on this issue, like his testimony on so many other issues, lacks credibility.

Thus, the foregoing evidence overwhelmingly establishes that Hale's testimony lacks credibility. Further, Hale's testimony, among other things, demonstrates the lengths to which BCT is willing to go to cover up its misconduct.

### B. Philips' Motions

Having examined and evaluated some of the evidence Philips presented in support of its motions, the court next examines whether those motions should be granted. The court first examines whether BCT violated the court's orders. The court then addresses whether spoliation of evidence occurred on BCT's part. Finally, the court addresses which sanctions would be appropriate in this case.

### 1. Did BCT Violate This Court's Direct Orders?

Before any consideration is given to sanctions for contempt of court, the court first examines whether BCT violated a court order.

As set forth in detail above, on August 18, 2009, this court entered an order granting Philips' motion to compel BCT to preserve relevant information. As part of that order, BCT was required to "[i]ssue and circulate a thorough litigation hold memo to employees likely to have relevant information," and to "[c]ease 'wiping' or 're-imaging' the hard drives of employees

likely to have relevant information until further order of the Court, or the termination of this litigation." (Doc. 99.)

Also as set forth in detail above, on September 22, 2009, this court verbally granted Philips' third motion to compel and ordered the parties to finalize a stipulation concerning the collection and processing of BCT's ESI by September 24, 2009. This court's September 28, 2009 written order incorporated the parties' stipulation regarding BCT's ESI and required BCT to provide Lighthouse with "immediate access" to all of BCT's "laptops, desk computers and all servers." (Docs. 110-11.) The September 28 order also required BCT to "fully cooperate" in the process of collecting, retrieving, and processing the ESI. (*Id.*)

Norberg's credible analysis reveals that massive deletions occurred following and in direct violation of those two court orders. First, on August 24, 2009, September 22, 2009, and September 23, 2009, Sokolowski deleted approximately 15,000 files and folders from his BCT laptop's hard drive. The deletions on September 22 occurred in the evening, just hours after this court verbally granted Philips' third motion to compel. As set forth above, more deletions were made the next morning between 6:40 a.m. and 10:04 a.m. EDT. Second, Gasparovich deleted files from his BCT laptop on the evening of September 22. According to Norberg, Gasparovich started deleting documents from his laptop at 5:39 p.m. - again, just hours after this court verbally granted Philips' third motion to compel - which behavior continued until 11:06 p.m. Gasparovich then began loading movies onto his laptop an hour later on September 23 at 12:02 a.m., permanently overwriting the files Gasparovich had just deleted. Third, on September 24, 2009, two days after this court ordered BCT to provide access to its ESI, Williams deleted and

wiped many thousands of files from his BCT laptop. Fourth, Norberg's analysis revealed that on September 24, 2009, Carter deleted five PDF files, a CD image file from his recycler folder, as well as 20,000 other files and folders. Finally, on October 2, 2009, Norberg's analysis revealed that Albuquerque deleted and intentionally wiped files from his laptop on October 2, 2009.

Thus, the credible evidence presented by Philips reveals that following this court's August 18 order requiring that all "wiping" and "re-imaging" of BCT employees' hard drives cease, as well as this court's September 22 verbal order, followed by its written September 28 order, compelling BCT to provide Philips with its ESI, five known BCT employees – some of whom were BCT executives – deleted thousands of files and folders from their laptops, and some of those employees then overwrote or wiped their computers to ensure that the deleted files were permanently deleted. These deliberate actions violated this court's direct orders: these BCT employees both "wip[ed]" and "re-imag[ed]" their hard drives. Further, the evidence reveals that most of that wiping and re-imaging occurred just before the employees were required to turn in their BCT laptops as part of the court's September 22 and 28 orders. Implicit in those orders was the requirement that BCT should ensure ESI was not deleted from, among BCT's other computers, the BCT laptops designated to be sent to Lighthouse. The purpose of the orders was to allow Philips to collect the BCT's ESI; obviously deleting and wiping the ESI on the five BCT laptops foiled the orders' purpose.

As a result, the court finds BCT in contempt of court because BCT violated this court's August 18, September 22, and September 28, 2009 orders.

## 2. Did Spoliation of Evidence Occur on BCT's Part?

The court next addresses whether, as Philips alleges, spoliation of evidence occurred in this case by BCT's willful destruction of evidence. "'Spoliation' has been defined as 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Asher Assocs. v. Baker Hughes Oilfield Operations*, No. 07-cv-01379, 2009 WL 1328483, at *5 (D. Colo. May 12,2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). Thus, spoliation is both the destruction of evidence and/or the failure to preserve evidence. As such, litigants have a duty to preserve documents or materials – including electronic documents and materials – that may be relevant to ongoing and potential future litigation. In most cases, the duty to preserve is triggered by the filing of a lawsuit, but that duty may arise even before a lawsuit is filed if a party has notice that future litigation is likely. *See Asher Assocs.*, 2009 WL 1328483, at *5 (citing *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (hereafter "*Zubulake IV*") which states "the obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future ligitation"); *see also Arista Records, LLC v. Usenett.com, Inc.*, 633 F. Supp. 2d 124, 139 (S.D.N.Y. 2009) (finding employer was under an obligation to preserve information stored on its employees' computers at least as early as the start of litigation). Compliance with this duty ensures that discovery permitted by Federal Rule of Civil Procedure 26(b)(l) does not become a futile exercise. *See Asher Associates*, 2009 WL 1328483, at *5.

This case was filed on January 16, 2008. Hale, BCT's President at the time, testified that he received the complaint at that time and was aware of the lawsuit. He also testified that he was aware of multiple concerns by Philips, at least by January 2005, when he received a warning letter from Philips' in-house counsel, Ed Uhl. Thus, even if BCT did not reasonably anticipate litigation from Philips' January 2005 letter, there is no question that it was under an obligation to preserve relevant documents - including relevant electronic documents - on its executives' and employees' computers no later than January 16, 2008, when this lawsuit was filed.

Cases across the country confirm that the duty to preserve means action must be taken to preserve evidence, meaning that it is not lost, destroyed, inadvertently or negligently overwritten, or intentionally wiped out, and that it is available to be produced to the other side. *See Zubulake v. UBS Warburg*, LLC ("*Zubulake V*"), 229 F.R.D. 422 (S.D.N.Y. 2004); *The Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Securities*, LLC, ___ F.Supp. 2d ___, 2010 WL 184312 (January 15, 2010 S.D.N.Y.). In the recent *Pension Committee* case, Judge Scheindlin, the original author of the *Zubulake* opinions, states:

> By now, it should be abundantly clear that the duty to preserve means what it says and that a failure to preserve records - paper or electronic - and to search in the right places for those records, will inevitably result in the spoliation of evidence.

2010 WL 184312, at *1. She further states that not only is there a common law duty to preserve evidence, but that parties have the obligation to ensure that the judicial process is not abused by making sure evidence is preserved. The court states:

> It is well established that the duty to preserve evidence arises when a party reasonably anticipates litigation. Once a party reasonably

anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents.

*Id.* at *4.

Because it is established that BCT was under a duty to preserve beginning at least on January 16, 2008, Philips next has the burden to demonstrate that documents were destroyed after the duty to preserve arose. Philips has met that burden. BCT's duty to preserve relevant documents, data, and information extended to the electronic files on the BCT laptop computers in question, *i.e.*, those used by Gasparovich, Carter, Williams, Albuquerque, and Sokolowski. While BCT originally denied that any relevant documents were deleted from the five laptops, after pursuing these three motions and discovering more evidence - including admissions at the Hearing by BCT executives and employees that they had purposefully and permanently deleted hundreds of documents, and testimony by BCT's own computer forensic expert confirming Philips' assertions that many hundreds of documents had been permanently deleted from the five BCT computers - BCT's counsel admitted in oral argument that many folders had been deleted intentionally from the five BCT laptops. (Official Transcript of the April 13, 2010 Motion Hearing (hereafter "Tr2.") at 41-42.) In addition, as is discussed in detail below, the evidence uncovered by Norberg revealed file names that strongly suggest many relevant documents to this litigation were among those intentionally and permanently deleted.

"Courts cannot and do not expect that any party can meet a standard of perfection. Nonetheless, the courts have a right to expect that litigants and counsel will take the necessary steps to ensure that relevant records are preserved when litigation is reasonably anticipated, and that such

records are collected, reviewed, and produced to the opposing party." *Pension Committee*, 2010 WL

184312, at *1. When such steps are not taken to preserve evidence, "the integrity of the judicial

process is harmed and the courts are required to fashion a remedy." *Id.* Parties and counsel must

be clear that "the duty to preserve means what it says and that a failure to preserve records - paper

or electronic - and to search in the right places for those records, will inevitably result in the

spoliation of evidence." *Id.*

Thus, both elements of spoliation have been met in this case. Philips has demonstrated that

BCT was under a duty to preserve and that BCT failed to meet that duty as to the five BCT laptops

in question. As a result, the court finds that spoliation of evidence occurred on the five BCT laptops

at issue before the court.

### 3. What is the Appropriate Sanction to Impose for BCT's Spoliation of Evidence and Contempt of Court?

The court has the power to sanction litigants for both spoliation of evidence and failure to

follow court orders regarding discovery. The court's right to impose sanctions for spoliation

arises from its inherent power to control the judicial process and litigation; however, that power

is limited to action that is necessary to redress conduct that abuses the judicial process. *See*

*Pension Committee*, 2010 WL 184312, at *2-3. The court has the obligation to ensure that the

judicial process is not abused; thus, "[t]he policy underlying this inherent power of the courts is

the need to preserve the integrity of the judicial process in order to retain confidence that the

process works to uncover the truth," *id.* "A spoliation sanction is proper where (1) a party has a

duty to preserve evidence because it knew, or should have known, that litigation was imminent,

and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. &*

*Santa Fe Ry. v. Grant*, 505 F.3d 1013, 1032 (l0th Cir. 2007) (citing *103 Investors 1, LP v. Square*

*D. Co.*, 470 F.3d 985, 989 (10th Cir. 2006)).

The court has authority to sanction a litigant who "fails to obey an order to provide or

permit discovery" under Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure.  Rule 37

provides that sanctions may include, among others, "striking pleadings in whole or in part,"

"dismissing the action or proceeding in whole or in part," or "rendering a default judgment

against the disobedient party."  Fed. R. Civ. P. 37(b)(2)(A)(iii), (v), (vi).

Dismissal is an extreme sanction which is only appropriate in cases involving willful

misconduct, s*ee Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992); therefore, lesser

sanctions must be considered before dismissing a case.  "'Because dismissal with prejudice

"defeats altogether a litigant's right to access to the courts," it should be used as "a weapon of

last, rather than first, resort."'" *Id.* (citations omitted).  "It is within a court's discretion to dismiss

a case if, after considering all the relevant factors, it concludes that dismissal alone would satisfy

the interests of justice." *Id.* at 918.  Further, an aggrieved party must also prove bad faith if it

seeks the benefit of an adverse inference to remedy the spoliation.  "'Mere negligence in losing

or destroying records is not enough because it does not support an inference of consciousness of

a weak case.'  Without a showing of bad faith, a district court may only impose lesser sanctions."

*Turner v. Public Serv. Co.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (citation omitted).

### a. Whether a Spoliation Sanction With an Adverse Inference is Warranted

As explained above, for the court to conclude that a spoliation sanction with an adverse inference is warranted in this case, Philips must show: (1) BCT had a duty to preserve evidence because it knew, or should have known, that litigation was imminent; (2) Philips was prejudiced by the destruction of the evidence; and (3) BCT acted in bad faith. The court addresses each of these elements in turn.

### i. Duty to Preserve Evidence

First, the court already has concluded that BCT had a duty to preserve evidence. As discussed above, BCT's duty to preserve was triggered by the filing of this lawsuit on January 16, 2008, if not before. As set forth above, the duty to preserve means a litigant must take action to preserve evidence to prevent it from getting lost, destroyed, inadvertently or negligently overwritten, or intentionally wiped out, so that it is available to be produced to the other side. As the court discussed and concluded above, BCT failed to meet that duty as to the five BCT laptops in question.

### ii. Prejudice

Second, the court examines whether Philips was prejudiced by the destruction of the documents on the five BCT laptops in question. In determining whether Philips has suffered prejudice from BCT's spoliation of the evidence, the court reviews some of the evidence presented to the court regarding the deletions made on the five laptops.

*Gasparovich*

Norberg determined that Gasparovich deleted and overwrote at least 1,800 files on his BCT laptop computer on the evening of September 22, 2009. *See* Ex. 62 at ¶¶ 5-7. Hooper, BCT's own computer forensics expert agreed with Norberg's findings regarding Gasparovich's deletions. *See* Tr. at 460. Gasparovich testified that he removed many electronic files from his BCT computer by either deleting them or moving them over to an external hard drive. *See* Tr. at 56-58. The ESI that Gasparovich removed from his BCT computer appears to have included technical information and files related to Philips' nuclear medicine systems which Dave Miller (a former trainer of Philips engineers) provided to Gasparovich, as well as numerous Philips SKYLight files.[29] *See* Tr. at 60-62. Norberg confirmed that a Dave Miller SKYLight folder was deleted and that this folder alone contained approximately 1,700 files.[30] *See* Tr. at 390-391. Gasparovich also admitted he either deleted the Philips TAC database from his BCT computer on September 22, 2009, or he transferred it to an external hard drive.[31] *See* Tr. at 65-66.

_____

[29]Gasparovich also testified that he is sure that he deleted Philips-related information from his computer prior to September 22, 2009. *See* Tr. at 76.

[30]Gasparovich admitted that he deleted from his computer certain technical information and files related to Philips' nuclear medicine systems, which Dave Miller (a former trainer of Philips engineers) had provided to Gasparovich. *See* Tr. at 60-62.

[31]Gasparovich's testimony on this point directly contradicts his deposition testimony, where he claimed that he did not even have a copy of the TAC database on his computer after his computer crashed a few years ago, in approximately February 2007. *See* Tr. at 69-70. Thus, he admits removing the TAC database from his computer in September 2009, despite the fact that he had previously testified that the TAC database had not been on his computer since February 2007.

Norberg determined that at least 100 files from Gasparovich's computer are permanently destroyed and thus cannot be recovered; Hooper, BCT's expert, agreed with this finding. *See* Tr. 447-448; Ex. 62 at ¶ 6; Tr. 461, 466. Gasparovich testified that he did not recall how many electronic folders he removed from his BCT computer. *See* Tr. 56-57. He also did not know what ESI was moved to the recycle bin. *See* Tr. at 58. Ultimately, Gasparovich admitted that the files that were on the replacement hard drive that was subsequently provided to Philips did not include all the files he deleted on the night of September 22, 2009. *See* Tr. at 89. Thus, it is undisputed that BCT did not provide Philips with copies of all files deleted by Gasparovich, nor can it, since Gasparovich cannot identify all the documents that he deleted.

Although 100 files deleted from Gasparovich's computer are permanently destroyed, the names of the destroyed files and file folders remain and demonstrate that the spoliated documents probably related to the claims and defenses at issue. For example, the file names of many documents Gasparovich deleted directly match the names of various Philips/ADAC allegedly confidential, proprietary and trade secret documents. *(Compare* Doc. 140, Norberg Dec., ¶¶ 6, 8, Exs. 1,3, *with* Doc. 139, Kindley Dec., ¶ 6, Ex. E.) Evidence that such materials were loaded onto the computer of BCT's Chief Technical Officer very likely would have been significant to Philips' trade secret and unfair competition claims.

The folder structure of the files Gasparovich deleted suggests that the deleted files were relevant to this litigation. This litigation involves claims of copyright infringement and trade secret misappropriation, among others. (Doc. 25.) A portion of Philips' copyright claim relates to BCT's copying and distribution of copyrighted service manuals. (*Id.* at 5-6.) Philips asserts

that BCT uses, makes copies, and distributes Philips/ADAC service manuals in its training programs.  (*See, e.g.,* Doc. 139, Kindley Dec., ¶ 7, Ex. H-I (answers to Request No. 8 and Interrogatory No. 2).)  The folder structure of the files deleted by Gasparovich suggests that a substantial portion of the deleted files constituted precisely this type of technical training materials, handouts, and schematics for Philips/ADAC brand nuclear medicine systems, including Forte, Single Head Genesys, Skylight, and Vertex.  (*See* Doc. 140, Norberg Dec., ¶ 6 Ex. 1; Doc. 25 at 6.)  Two other files deleted by Gasparovich literally were titled "copyright_philips_medical_system.htm."  (Doc. 140, Norberg Dec., ¶6, 1.)  Evidence that Gasparovich, BCT's Chief Technical Officer, created new copies of the copyrighted manuals (by copying them onto his computer, for instance) and used or distributed those manuals in BCT's training classes likely would be very beneficial to Philips' federal copyright infringement claim. *See, e.g.*, 17 U.S.C. § 106 (copyright owner has exclusive right to, among other things, reproduce and distribute copies of copyrighted works).

Gasparovich's deletions of relevant files has precluded Philips from discovering and understanding the full scope of BCT's trade secret misappropriation and copyright infringements and has impeded Philips' ability to obtain evidence relevant to the claims and defenses at issue in this case.

***Williams***

Norberg determined that, on September 24, 2009, Williams deleted 134,000 files and folders from his BCT laptop computer, as follows:  (1) 97,000 files and folders from *My Documents/Jerry'sbackup;* (2) 2,400 files and folders from *My Documents/Add; (3)* 5,600 files and folders from *Software 1; and* (4) 29,000 files and folders from *Jerry/New Volume (E)*.  *See* Ex. 62 at ¶ 12.  Hooper's findings with respect to Williams' computer were again consistent with Norberg's.  *See* Tr. at 460.  Also, Williams did not dispute Norberg's findings regarding the massive number of files that he deleted.  *See* Tr. at 257.

Information gleaned regarding the thousands of files Williams destroyed suggests that they were incriminating to BCT.  Williams destroyed excel spreadsheets containing details regarding Philips/ADAC's installed base.  (Doc. 140, Norberg Dec., Ex. 10.)  He destroyed software folders containing AutoQUANT, AutoSPECT, and Pegasys files, the software at issue in Philips' copyright infringement claim.  (Doc. 140, Norberg Dec., ¶ 12, 8.)  He destroyed a folder named "philips dvd," apparently including technical training files from the Philips Healthcare Academy.  It appears he wiped out folders that related to Tech Tips, Philips/ADAC manuals, Philips/ADAC software files, as well as Philips/ADAC's TAC database.  (Doc. 140, Norberg Dec., Ex. 10.)

Norberg determined that in excess of 3,000 of the files deleted by Williams from his BCT computer were permanently destroyed, and Hooper (BCT's expert) confirmed that this number is accurate.  *See* Ex. 62 at ¶ 16; Tr. at 412, 462.  Norberg testified that it is not possible to recover any of the files shredded using AbsoluteShield.  *See* Tr. at 423.  Many of these files most likely

were very relevant to this case because, even though Williams ran them through a file shredder program, Norberg was able to determine the path of some of these documents and that they came from subfolders labeled, for example, 7.5.1 Forte software, Atlas MCD, utility disc, Software/Tech Tips/Gearbox, and so on. *See* Tr. at 418-21.

Similarly, the "philips dvd" folder Williams deleted from his BCT laptop is permanently destroyed. *See* Tr. at 410-11; Ex. 11 to Ex. 62. This folder contained seven files, yet the Philips DVD folder that was subsequently provided to Philips was empty. *See* Ex. 55 at ¶ 19; Ex. 70; Tr. at 427-29.

Norberg also testified that, although he did not have time to do a thorough review of BCT's replacement hard drive, Norberg did confirm that some of the files destroyed by Williams were not included in the replacement drive. *See* Tr. at 424. For example, Norberg determined that the "Backup DT" folder Williams deleted was not on the replacement hard drive subsequently provided by BCT. *See* Tr. at 425-27; Ex. 70. In addition, the Software 1 folders on the replacement drive do not contain the same number of files as any of the three Software 1 folders that Williams deleted from his BCT laptop computer.[32] *See* Tr. at 428-29.

---

[32]Williams admitted that he had no idea whether the Software 1 folders that he deleted from his computer are duplicated on the BCT server. *See* Tr. at 261. Philips alleges that if those folders were duplicated, BCT has failed to produce them in response to Philips' discovery requests.

*Carter*

Norberg determined Carter deleted five pdf files and a CD image file from his BCT laptop computer on September 24, 2009. *See* Ex. 62 at ¶ 11. In addition, Norberg found that Carter deleted a folder named "Marcus" that contained approximately 20,000 files. *See* Tr. at 432. These deleted files likely included ESI that is relevant to this case: included in the deleted files was a folder labeled "ADAC" that contained 6,900 files, as well as a folder labeled "Siemens" that contained 9,100 files. *See* Tr. at 432-33. In the ADAC folder were subfolders called ADAC parts book, Atlas, Atlas Ultra, Cardio MD Class Docs, Cardio MD 1.8, Cardio MD 1.8.1, Cardio MD 2.0, Forte, Forte Data, Forte Information, Forte Documents, Jetstream AC Detector, Genesys, among many others. *See* Tr. at 435-36. BCT represented that of the 19,458 Marcus files, 18,653 were recovered, leaving 805 files unrecoverable.

*Albuquerque*

Norberg determined that Albuquerque deleted approximately 2,200 files from his BCT laptop computer on October 2, 2009. *See* Ex. 62 at ¶ 8. Once again, Hooper agreed with Norberg's findings regarding these deletions. *See* Tr. at 460. Albuquerque admitted that, when he left Philips' employment, he took all design documents and design information he was working on for Philips' medicine systems (including Philips' newest technologies, BrightView and Precedence). He loaded those materials on a flash drive and later copied these files onto his BCT laptop computer. *See* Tr. at 303-4. He testified that he deleted the directory that contained these allegedly proprietary and confidential electronic files from his BCT laptop computer and then ran Cipher to make sure the deleted documents could not be recovered, just before he sent it

to BCT.  *See* Tr. at 306-307, 343-44.  Norberg testified that Albuquerque's use of the Cipher program permanently destroyed 2,200 files so that none of this data could be recovered.  *See* Tr. at 440-41; Ex. 62 at ¶¶ 8-10.  Once again, Hooper agreed with Norberg's findings.  *See* Tr. at 460-461.

As set forth above, Albuquerque testified that he never shared with BCT the information he took from Philips.  Albuquerque also testified that the reason he deleted the Philips information from his laptop was to honor the confidentiality agreement he made with Philips and not share it with BCT.  Nonetheless, Philips is now precluded from checking Albuquerque's testimony with the information his files would have provided, such as when he last accessed those files.[33]

*Sokolowski*

As set forth in the memorandum supporting Philips' second spoliation and contempt motion, Philips subsequently discovered that Sokolowski, BCT's Regional Service Manager and Director of PET, deleted approximately 15,000 files and folders from his BCT laptop computer between August 24, 2009 and September 23, 2009.  (Doc. 176 (Norberg Dec.), at ¶ 7.)

_____

[33]BCT argues that Albuquerque deleted his files because they were not relevant to this litigation because Albuquerque had not shown the Philips files to BCT.  Such a determination was not for Albuquerque to make.

> The argument of an accused spoliator that it did not violate its duty to preserve evidence because it retained the "relevant" information and only deleted "irrelevant" information rings particularly hollow. The ultimate decision of what is relevant is not determined by a party's subjective assessment filtered through its own perception of self interest.'

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 518, n.12 (D. Md. 2009).

Significantly, Hooper confirmed Norberg's findings regarding Sokolowski's deletions. (Doc. 194-7 (Hooper Dec.), at ¶ 6.) Included within the massive deletions were "proprietary" files Sokolowski acquired while employed by UGM (and later ADAC and Philips, following ADAC's acquisition of UGM and Philips' acquisition of ADAC). (Doc. 194-6 (Sokolowski Dec.) at ¶¶ 5-9.)

According to BCT's own expert, only 4,500 of the 15,000 files deleted by Sokolowski are recoverable. (Doc. 176 (Norberg Dec.), at ¶ 7; Doc. 194-7 (Hooper Dec.) at ¶¶ 6-7.) Thus, Sokolowski permanently destroyed approximately 10,500 of the 15,000 files he deleted from his BCT laptop. *See id.*

In his opening statement at the Hearing, counsel for BCT stated that the "question is whether evidence is fully and currently lost." Tr. at 13-14. BCT's counsel went on to represent to the court that: (1) BCT has "reconstructed all information" which Philips' expert said was deleted from Gasparovich's computer; (2) BCT has furnished all deleted information from Carter's computer; and (3) all but a few of the files which Williams deleted have now been reconstructed and sent to Philips. Tr. at 14. To the contrary, the evidence at the Hearing established that each of these representations was false. Even Hooper, BCT's forensic computer expert, testified to the contrary of these representations.

In sum, Norberg's uncontradicted testimony was that thousands of files are permanently gone and cannot be retrieved or recovered. *See* Tr. at 441-44. Norberg stated, "my opinion is there are files that we'll never know existed and that are permanently gone, and there's no way to tell whether we get them back or not at this point." Tr. at 442. He also testified that Williams'

use of AbsoluteShield, Albuquerque's use of Cipher, as well as Gasparovich's overwriting of data, had the following result: ". . . there's no way to tell what was on those computers before they were turned over to us. So whatever we get now from the defendants, we have no idea whether what we're getting was contained on those computers or not." Tr. at 442-43. His testimony also unequivocally established that many files are simply not recoverable. *See* Tr. at 442. Approximately 17,800 electronic files were permanently destroyed by BCT, as follows:

> At least 100 files from Gasparovich's computer. *See* Tr. at 447-48; Ex. 62 at ¶ 6.
>
> In excess of 3,000 files from Williams' computer. *See* Ex. 62 at ¶ 16.
>
> At least 805 files from Carter's computer. *See* Tr2. at 54.
>
> 2,200 files from Albuquerque's computer. *See* Ex. 62 at ¶ 8.
>
> 10,500 files from Sokolowski's computer. *See* Doc. 176 (Norberg Dec.) at ¶ 7; Doc. 194-7 (Hooper Dec.) at ¶¶ 6-7.

BCT's willful and permanent destruction of thousands of documents deprives Philips of the opportunity to review them to find: (1) supporting evidence regarding its claims of copyright infringement, federal trademark infringement (under 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125 (Section 43(a)(1) of the Lanham Act)), misappropriation of trade secrets, tortious interference with business relations, violations of the Utah Unfair Competition Act, and (2) exonerating evidence regarding BCT's counterclaims. Furthermore, as discussed above and below, most of BCT's witnesses lack credibility, making it difficult to trust that the alleged replacement files and folders are the same files and folders that were deleted from the five laptops.

Philips' expert has gone to great lengths to glean as much information as possible regarding the deleted ESI, and the information revealed from those efforts supports Philips' argument that BCT's destruction of its ESI prejudiced Philips' ability to prove its claims and defenses. Despite these careful efforts, it is impossible to determine the contents of the thousands of permanently deleted files and folders. BCT's intentional destruction of the evidence would be rewarded were the court to hold Philips to a strict standard of proving the destroyed files' content and whether its destruction prejudiced Philips' case.

In addition to these reasons for finding Philips has been prejudiced, "the general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997); *Computer Assocs. Int'l, Inc. v. American Fundware, Inc.*, 133 F.R.D. 166, 170 (D. Colo. 1990) ("It is familiar doctrine that if a party fails to produce from within its control evidence that is relevant and material, the fair inference is that the evidence would have weighed against the party who held it back."). As set forth below, the court has concluded that BCT's spoliation of the evidence and violation of the court orders occurred in bad faith. As a result, the court infers that Philips has been prejudiced in proving its claims and counterclaims by BCT's destruction of the ESI.

### iii. Bad Faith

Third, the court examines whether BCT's spoliation of the evidence was done in bad faith.

*Pension Committee*, which provided this court with guidance in determining prejudice, also provides guidance in determining culpability in this case. The *Pension Committee* court explained that although many cases and treaties have defined negligence, gross negligence, and willfulness in the context of tortious conduct, that court had found no clear definition of those terms in the discovery misconduct context. *See* 685 F. Supp. 2d at 463. *Pension Committee* explained that these terms describe a continuum of unacceptable behavior, and involves judgments that cannot be measured with exactitude; however, negligence involves unreasonable conduct in that it creates a risk of harm to others, but willfulness involves intentional or reckless conduct that is so unreasonable that harm is highly likely to occur. *See id.* at 463-64. *Pension Committee* defined willful, wanton, and reckless conduct as that which "requires 'that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.'" *Id.* at 464 (quoting Prosser & Keeton on Torts § 31 at 213 (5th ed. 1984) (citing *Restatement (Second) of Torts § 500* and collected cases)).

In applying these standards to the discovery context, *Pension Committee* gave some possible examples of negligent, gross negligent, and willful conduct in the discovery misconduct context. The court explained that a failure to preserve evidence may be negligent, grossly

negligent, or willful, but the intentional destruction of relevant records - either paper or electronic - was clearly willful conduct.  Under current law, the failure to issue a written litigation hold constituted gross negligence because it was likely to result in destruction of relevant information.  *See id.* at 464-65.  Regarding the collection and review of evidence, after the duty to preserve attaches, the failure to collect either paper or electronic records from key players, the destruction of email, or the destruction of backup tapes was grossly negligent or willful behavior.  *See id.* at 465.  *Pension Committee* explained that each case turns on its own facts and "the varieties of efforts and failures is infinite."  *Id.*

As set forth below, having carefully examined the arguments made and the evidence presented in this case, the court concludes that BCT's spoliation of evidence was done in bad faith.

### *Responsibility and Control*

Bad faith, or culpability, "may not mean evil intent, but may simply signify responsibility and control."  *Phillip M. Adams & Associates, L.L.C. v. Dell, Inc.*, 621 F. Supp. 2d 1173, 1193 (D. Utah 2009).  The court concludes that BCT not only had the responsibility to preserve information relevant to this litigation on the five laptops, but that it also had control over those laptops and the information stored on them.

It is undisputed that BCT owned each of the laptop computers in question, that the information and data stored on those computers was BCT's property, and that BCT enjoyed control over the information on its company computers.  *See* Ex. 22; Tr. at 34, 37, 151.  BCT's Employee Manual provided that BCT reserved the right to access, inspect, and search its

computers at any time. *See* Ex. at 27. At the Hearing, each BCT employee who was asked about this policy testified that he understood the laptop and information stored thereon were BCT's and that BCT could take away a laptop from a BCT employee at any time. Thus, BCT had the ability to exercise full control over any of its laptops, including those at issue in this case.

As a litigant in this case, BCT also had the responsibility to take measures to preserve evidence, including ESI. Under the federal rules, in addition to this court's discovery orders, BCT and its counsel were expected to take the necessary steps to ensure that relevant records - including ESI - were preserved when this litigation was reasonably anticipated or began, and that those records were collected, reviewed, and produced to Philips during the discovery process.

BCT makes two arguments that BCT as a company was not responsible for the ESI's destruction. First, BCT argues that the executives and employees who destroyed documents were simply deleting personal information and inadvertently deleted other files. The court rejects this argument because it simply is not supported by the evidence. The evidence Philips presented reveals that many of the thousands of electronic documents deleted from the five BCT laptops were not personal documents and were intentionally deleted.

Second, BCT argues that it is not responsible for the ESI's destruction because the executives and employees who destroyed the documents were acting individually and contrary to BCT's express directives not to delete documents from their laptops. In order to properly address this argument, the court first examines BCT's behavior and attitude throughout this case towards meeting its responsibility to preserve evidence.

Hale, BCT's founder and former CEO, admits that he received a letter dated January 18, 2008, from Philips' legal counsel, together with a copy of the Complaint. *See* Tr. at 140-41; Ex. 26. Hale admits that he read the Complaint and was on notice at that time of the specific claims which Philips was asserting against BCT. *See* Tr. at 140-141. Hale claims that at some point after the lawsuit was filed, he talked to Biddle, BCT's Chief Operating Officer, and told him that "we're not supposed to delete anything." Tr. at 141. Hale does not remember when he had this discussion with Biddle, or if he told Biddle what needed to be done to make sure that relevant files were not deleted. *See* Tr. at 141-42.

Despite knowing of the lawsuit and the claims alleged, it is undisputed that until June 23, 2009 - 17 months after the lawsuit was filed - no written instructions were sent to BCT employees to preserve documents related to the Philips lawsuit. Further, there is no documentary evidence that BCT did anything to fulfill its duty and obligation to preserve any relevant documents for over a year and a half after the lawsuit was filed. Gasparovich testified that, after the lawsuit was filed, BCT did not change any of its practices to ensure that relevant documents stored on its computers were not deleted or destroyed, and that before receiving the September 22, 2009 email instructing him to send in his BCT laptop, he had never been informed that the court had ordered BCT to cease wiping or re-imaging its computer hard drives. *See* Tr. at 32, 33-34. Biddle himself testified that, until August 18, 2009, when this court ordered BCT to preserve all of its backup tapes, BCT routinely overwrote them. *See* Tr. at 118-19. Thus, it is undisputed that during the first twenty months while this lawsuit was pending, BCT failed to preserve its computer back up tapes.

In April of 2009, fourteen months after the lawsuit was filed, BCT held an annual conference attended by the majority of its field service engineers; however, despite this gathering and opportunity to explain BCT's responsibility to preserve evidence, BCT's failure to instruct its employees to preserve documents related to this lawsuit continued. *See* Ex. 1.; Tr. at 145. Moreover, even though one of the slides in the presentation copied a Philips' request for production of documents identifying 48 BCT (and former Philips) employees whose personnel files had been requested, BCT did not take any steps to ensure that these employees were preserving files or documents on their laptops or do anything else to preserve the data on those employees' company computers.[34] *See* Tr. at 146-147.

In addition, the first written instruction, sent on June 23, 2009, consisted of a cursory email sent by Biddle - following his deposition earlier that day where he was questioned about what efforts BCT had made to preserve information - to all BCT employees wherein he instructed BCT employees "to save any electronic records that could possibly be associated in any way to the Philips lawsuit." *See* Exhibit 1 to Ex. 56; *see also* Tr. at 92, 101, 148. Significantly, this email did not tell BCT employees what the Philips lawsuit was about, nor did it identify what types or categories of documents should be preserved. Moreover, the email was ineffective since many witnesses did not read it, receive it, or could not remember it. Gasparovich, BCT's Chief Technical Officer and part owner (until the MSouth sale), testified that "[t]here was never any official notification" by BCT's management informing its employees

---

[34]Williams, Carter, and Albuquerque all testified that no one at BCT ever contacted them to get relevant information on their computers. *See* Tr. at 234 , 284-285, 313-314.

about the Philips lawsuit and employees found out about the lawsuit only through hearsay. *See id.* at 28.

Finally, nineteen months after this lawsuit was filed, BCT issued a Litigation Hold Memo, dated August 19, 2009, which was sent to BCT employees on August 25, 2009. BCT created the Litigation Hold Memo only after this court compelled BCT to create one. It was only the second written document sent to BCT employees acknowledging this lawsuit and informing them of BCT's duty to preserve evidence. While Biddle said he expected all BCT employees to carefully read the Litigation Hold Memo, he himself just skimmed the memo and did not read it in detail. *See* Tr. at 105.

The evidence at the Hearing strongly indicated it was unlikely most BCT employees read the Litigation Hold Memo. Gasparovich, BCT's Chief Technical Officer and a member of its executive management team, testified that he had never even seen the Litigation Hold Memo (which was attached as Exhibit 1 to his January 20, 2010 Declaration (*see* Exhibit 52)) until it was shown to him at the Hearing. *See* Tr. at 30. His testimony on this point directly contradicted his sworn Declaration, wherein he testified that he received the Litigation Hold Memo in August of 2009. *See* Ex. 52 at ¶ 9. Gasparovich admitted that he failed to "look at" this exhibit to his Declaration before he signed it, he only "scantily" read the Declaration itself, and did not read it in "great detail." Tr. at 32, 87.

Williams testified that he never received or saw Biddle's June 23, 2009 email because his computer hard drive had crashed. *See* Tr. at 225. Williams further testified that although he received the August 25, 2009 email to which the Litigation Hold Memo was attached, he "didn't

take the time to read that email." Tr. at 225-226.  Albuquerque, BCT's Vice President of Product

Development and its District Manager for New York City, testified that if he received

information in an email, he probably did not read it because he gets a lot of emails every day.

*See Tr.* at 314-15.  Albuquerque testified that it is common knowledge at BCT that most

employees do not read emails from management and, if Albuquerque wanted to communicate

something that was really important, he called the person directly or set up a conference call.  *See*

Tr. at 314-15.

BCT's failure to fulfill its duty and obligation to preserve relevant files  is highlighted by

Albuquerque's testimony.  *See* Tr. at 301.  It is undisputed that Albuquerque had proprietary and

confidential design documents related to key Philips' projects on which Albuquerque had worked

as a Philips engineer, *see* Tr. at 303-05, yet during the first twenty months of the lawsuit, neither

BCT nor its counsel ever contacted Albuquerque to determine what he had or even to inform him

what the case was about, *see* Tr. at 309-14.  Until a couple of days before his deposition in

November of 2009, Albuquerque had never read Philips' Complaint.  *See* Tr. at 309-10.  Up to

that point, he believed that Philips' claims were limited to trademark or copyright infringement

and he was unaware of Philips' other claims.  *See* Tr. at 309-10.  Albuquerque was never shown

a copy of the Protective Order in this case and testified that he was never provided with a copy of

the Litigation Hold Memo.[35]  *See* Tr. at 310-311.  The first time an attorney talked to him about

---

[35]Upon further questioning by BCT's counsel, Albuquerque changed his testimony on this
last point and said, "I believe I received" the email transmitting the Litigation Hold Memo
because it was sent to all employees, but he said he did not recall the email.  *See* Tr. at 361-362.

his deletion and destruction of ESI was February 9, 2010, the day before he testified at the Hearing, and it was not until then that he understood that there was an issue or problem with what he had done. *See* Tr. at 311-12. Moreover, no one from BCT ever contacted him for the purpose of responding to discovery requests, or to tell him that the proprietary information he deleted about Philips' newest nuclear medicine system, BrightView, was a key part of BCT's case, or that that information was responsive to Philips' discovery requests. *See* Tr. at 314. Similarly, he was never informed about, or shown, this court's orders, including the order compelling BCT to preserve data. *See* Tr. at 317-318; Exs. 77 and 78.

Therefore, even after Biddle emailed the Litigation Hold Memo to all BCT employees, because it was common knowledge in the company that many executives and employees did not read their email, simply sending the short June 23 memo and the Litigation Hold Memo by email was not enough of an active and earnest effort on BCT's part to effectively communicate with BCT's employees and to preserve evidence. Also, other commonsense actions were not taken to preserve evidence, such as interviewing key employees, or even asking them to produce discoverable information. BCT appears to have been merely going through the motions rather than genuinely trying to preserve evidence since this method of communication was known to be unreliable and ineffective within the company; thus, BCT was not fulfilling its responsibility to diligently and thoroughly ensure that relevant documents were preserved.

Although several of the witnesses testified that they were involved with a phone call in which they were informed not to delete information from the laptops, Albuquerque and Carter did not participate in a similar phone call. In addition, the fact that after the phone call, several

key employees still deleted a massive number of files from their computers - and then tried to cover up those deletions with sophisticated software and lies to this court - reflects the overall attitude BCT has manifested from the beginning of this case: one of indifference - and possibly defiance - to the rules of discovery, orders of this court, and the integrity of the judicial process generally. BCT's sparse and ineffective communication with its employees does not relieve it of its responsibility of its employees' actions in disobeying direct court orders and destroying massive numbers of electronic documents.

BCT's behavior in this case can be characterized as willfulness because it is reckless conduct that is so unreasonable that harm is likely to occur.[36] *See Pension Committee*, 685 F. Supp. 2d at 463-64. As discussed above, *Pension Committee* defined willful, wanton, and reckless conduct as that which "requires 'that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.'" *Id.* at 464 (citations omitted). BCT's behavior, such as failing to timely issue a litigation hold, failing to follow up on that litigation hold, failing to request discovery documents from key employees, and so forth, reveals its intentional failure to meet discovery obligations and its flagrant disregard of the obvious great risk that it was highly

---

[36]The court notes that from the beginning of this case, BCT has only produced documents in discovery after a motion, and in most cases a court order, was filed. (Doc. 262, Declaration of Roger Kindley In Opposition to Motion for Leave to Withdraw as Counsel, ¶ 11.)

probable the destruction of relevant documents would result from its behavior, and BCT's conscious indifference to the consequences of that risk.

BCT cannot escape responsibility by claiming the computers it owned, which were being used by its Chief Technical Officer, a Vice President, a part owner and Regional Service Manager, and others, had information deleted because these employees did not know of the court's orders or because they were acting in violation of BCT's directives. BCT is not some abstract entity; instead, BCT is comprised of its executives and employees. BCT's executives, in particular, act as company representatives. In this case, those executives disregarded court orders, willfully destroyed the evidence, and lied under oath.

BCT is the party; it has the responsibility; it must follow the court's orders. The justice system would break down if company employees could claim that they did not know about the court orders and simply disregard them. BCT has not pointed to any case that supports its argument. As a result, the court rejects BCT's second argument - that the BCT executives and employees were acting as individuals against the company's wishes - thus seeking to obviate itself of its responsibility of the massive deletions of ESI from the five BCT laptops.

Therefore, because BCT had control and responsibility over the five laptops, that alone is enough to establish that BCT acted with bad faith in the spoliation of the evidence. Because other evidence exists supporting this finding of bad faith, the court also examines other factors that have contributed to the court's finding of bad faith: the timing of the deletions at issue; the number of deletions made; the lack of effective communication BCT had with its employees regarding their duty to preserve evidence; BCT's employees' lack of credibility and attempts to

98

cover up and deny the deletions that occurred; and the deliberate, calculated, and methodical behavior involved in the deletions.

### Timing of Deletions

In this case, almost all of the deletions took place a day or two before the BCT laptop computers in question were sent to be imaged by Lighthouse. *See* Ex. 62 at ¶¶ 5, 8, 11 and 12. Further, these deletions took place *after* this court issued its August 21, 2009 order compelling BCT to cease "wiping" or "re-imaging" the hard drives of the employees in question, among others, and warning BCT that a failure to comply with its preservation obligations could result in sanctions or spoliation instructions, *see* Ex. 77; *after* this court compelled BCT to turn over its ESI; and *on the eve* of this court's ordered collection of BCT's ESI (Ex. 78 (the written order confirming the Court's September 22, 2009 oral order)).

### Numbers Involved

The numbers in this case are significant. As set forth in detail above, BCT deleted thousands of files, and thousands are not recoverable.

In addition, of the ten BCT custodians' hard drives for which Lighthouse captured forensic images, five revealed willful efforts to destroy relevant files, each following and in direct violation of this court's orders compelling the production of BCT's ESI. It is unknown how many other BCT executives and employees similarly destroyed evidence. Uncovering the information on these five computers alone has been very expensive; it would be time and cost prohibitive to collect and analyze forensic images of every BCT executive's and employee's hard drive.

*Lack of Effective Communication Between BCT and Its Employees*

  *Zubulake V*, cited above, has entire sections devoted to counsel's duty to monitor

compliance and counsel's duty to locate relevant information.  229 F.R.D. at 423, 431-32.  In

part, that court stated:

> A party's discovery obligations do not end with the implementation
> of a litigation hold, to the contrary that's only the beginning.
> Counsel must oversee compliance with the litigation hold,
> monitoring the party's efforts to retain and produce the relevant
> documents.  Proper communication between a party and her lawyer
> will ensure (1) that the relevant information (or at least all sources
> of relevant information) is discovered, (2) that relevant information
> is retained on a continuing basis, and (3) that relevant
> nonprivileged material is produced to the opposing party.
> . . .
> Unless counsel interviews each employee, it is impossible to
> determine whether all potential sources of information have been
> inspected."

*Id.* at 432.

  The evidence offered at the Hearing revealed a disparity between these discovery

principles and what happened in this case.  BCT employees were not informed about the

litigation or what it involved.  The witnesses testified that they were never asked to produce

documents in discovery, even though Biddle submitted a Declaration to this court claiming a

search had been made for all documents containing the terms "Philips" or "ADAC" and that they

had all been produced.  See Ex. 44, ¶ 2.  Many of these witnesses were never interviewed at all

until 2010, after the motion for spoliation had been filed in December 2009.  Albuquerque, one

of BCT's Vice Presidents, was not told any details of this litigation until February 9, 2010, the

day before the Hearing.

Had it fulfilled its obligations pursuant to discovery to preserve evidence, BCT would have collected its key players' computers. BCT had from January 2008 until the spoliators started destroying evidence in late 2009 to take appropriate steps to preserve the ESI. In April 2009, when the specific names of key employees was part of a PowerPoint presentation, BCT made no attempt to communicate with those employees at that time, even though they were all present, and no attempt was made to gather any information on their computers, which everyone admitted to be BCT's company property. Had BCT fulfilled its discovery obligations in the first place, the issue of personal information, relevant information, or what the employees subjectively thought likely would not be an issue at this point.

*Lack of Credibility and Attempted Cover Up*

The evidence Philips has offered in support of its motions reveals contradictions in witnesses' testimonies, blatant lies made under oath, and other attempts BCT employees made to cover up their deletions made on the BCT laptops.

As set forth above, BCT executives and employees testified that they were merely deleting personal information. That testimony is directly contradicted by both Norberg and Hooper's extensive findings, including the deliberate and calculated effort that had to have been made to destroy certain ESI.[37]

---

[37]The credibility of this assertion is made suspect further because the parties stipulated to and the court signed a Protective Order which expressly protects personal and private employee information. In addition, Biddle testified that Rampton, BCT's counsel, "made it clear" that all such personal information "would be protected," further emphasizing that the employees need not have been concerned about leaving personal information on their laptops. Tr. at 126.

> A party's willingness to fabricate evidence bears on
> character and credibility, which often is broadly at issue in
> a given case. In addition, when a party willfully submits
> false evidence, it imposes substantial burdens not only on
> the opposing party, but also on the judicial system itself, as
> the extent and relevance of the fabrication are
> investigated…. Moreover, when false evidence or
> testimony is provided under oath, knowingly and with
> intent to deceive, a party commits a fraud on the court.

*Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1181 (10th Cir. 2009).[38]

BCT's dishonesty and efforts (perhaps even strategy) to hide and destroy ESI shred

BCT's credibility and reveal BCT's overall contumacious and dishonest attitude toward this case,

this court, and the system of justice. This inexcusable behavior and attitude greatly contribute to

this court's finding of bad faith. BCT must be excoriated for filing false sworn declarations,

giving testimony riddled with lies and deceit, and making false representations to this court.[39]

---

[38]Courts looking at this issue have also noted the same problems. This was pointed out
by the court in *Goodman v. Praxair Services, Inc.*, 632 F.Supp. 2d 494 (D. Md. 2009). In that
case, the court stated:
> The argument of an accused spoliator that it did not violate its duty
> to preserve evidence because it retained the "relevant" information
> and only deleted "irrelevant" information rings particularly hollow.
> The ultimate decision of what is relevant is not determined by a
> party's subjective assessment filtered through its own perception of
> self interest.
*Id.* at 518, n. 12.

[39]Another case which addressed the claim of "personal information" being deleted was
the case of *Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006). Just like in this case, the
spoliator claimed he was only deleting and "wiping out" personal information. At least in the
*Leon* case, Dr. Leon admitted in his deposition to deleting entire directories of personal files.
Nevertheless, the court found that Leon was extremely evasive and acted in bad faith. As the
court stated:

### *BCT's Deliberate, Calculated, and Methodical Behavior*

As discussed and examined at length above, the deletions at issue were not an accident, but were made intentionally and methodically. The deletions were then, in some cases, followed by deliberate and calculated behavior meant to cover up the deletions through sophisticated wiping, shredding, or overwriting, all in direct disobedience to this court's orders. Furthermore, several BCT employees gave false or misleading statements to the court denying their behavior until evidence was set forth that directly contradicted their assertions; and employees appear to have given false statements to the court on more than one occasion.

After carefully considering each of these factors, the court finds that BCT acted in bad faith, not just because it had control and responsibility of the five laptops and the information contained therein, but also because of the timing of the deletions; the number of deletions made; the lack of BCT's effective communication with its employees regarding their duty to preserve evidence; BCT's executives' and employees' lack of credibility and apparent attempts to cover up and deny the deletions that occurred; and the deliberate, calculated, and methodical behavior involved in the deletions.

---

The court also found that Leon acted in bad faith. While Leon claimed that his wiping of relevant evidence was merely negligent because he meant to wipe only "personal" information, Dr. Leon did not have the authority to make unilateral decisions about what evidence was relevant in this case. The court concluded "that the extraordinary measures to which Dr. Leon resorted to destroy evidence relevant to this litigation merits a finding of bad faith."
464 F.3d at 956-57. The *Leon* court dismissed Dr. Leon's claim and entered judgment against him because he had deleted 2,200 files from his computers and then used a program to "wipe" any deleted files from the unallocated space on the hard drive. *See id.* at 963.

Thus, having found that (1) BCT had a duty to preserve evidence at least when the complaint was filed in this case, and over 18 months before the deletions at issue occurred; (2) Philips was prejudiced by the destruction of the evidence; and (3) BCT acted in bad faith, the court concludes that spoliation sanctions are appropriate in this case, including an inference that production of the destroyed documents would have been unfavorable to BCT.

Having concluded that a sanction is appropriate for spoliation and for violating the court's discovery order, and having found that BCT acted in bad faith and that an adverse inference is thus warranted in this case, the court next considers what resulting sanction or sanctions are appropriate to impose.

### b. *Ehrenhaus* Factors

A determination of the correct sanction for a discovery violation is a fact-specific inquiry. The court must consider a number of factors, and particularly those five set forth by the Tenth Circuit in *Ehrenhaus v. Reynolds*. *See* 965 F.2d 916 (10th Cir. 1992). Although the *Ehrenhaus* "factors do not constitute a rigid test . . . they represent criteria for [this] court to consider prior to imposing dismissal as a sanction." *Id.* at 921. The five *Ehrenhaus* factors are: "(1) [T]he degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; . . . (3) the culpability of the litigant"; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions." *Id.* at 921 (citations omitted). Therefore, in order to properly determine what sanction would be appropriate for this court to impose on BCT for violating this court's orders and destroying evidence, the court next examines each of the five *Ehrenhaus* factors.

### i. Degree of Prejudice to Philips

The court discussed the prejudice to Philips above. BCT's spoliation of evidence and violation of this court's orders have put Philips in the position of prosecuting this lawsuit (and defending itself against BCT's counterclaims) with incomplete information. Based upon the file names and data Philips has been able to recover, it appears that the files and folders BCT destroyed were relevant and important to the claims and defenses at issue in this case. For example, the file and folder names that remain indicate BCT destroyed documents that were related to Philips/ADAC's technical materials and trade secrets, its copyrighted service manuals and software, and its installed base of customers, among others. (Doc. 140, Norberg Dec., ¶¶ 6-16, Ex. 1-13.) Philips' ability to fully prepare this case for trial has been permanently, irreparably, and significantly damaged.

### ii. Interference With Judicial Process

BCT's behavior as it relates to the five laptops at issue has interfered with the judicial process in several ways. BCT destroyed a massive number of documents and disobeyed two direct court orders. In response to Philips' assertions that this behavior had occurred, several BCT employees and executives - including BCT's Chief Technical Officer and Chief Operating Officer - gave false statements at depositions and/or within sworn declarations to this court. Further, during the Hearing, many BCT witnesses - including BCT's Founder and CETO - contradicted his testimony and was presented with evidence that contradicted his testimony, casting extreme doubt on his credibility. BCT's Founder and CETO even admitted that he lied in his deposition and at the Hearing. As stated above, "[w]hen false evidence is provided under

oath, knowingly and with intent to deceive, a party commits a fraud on the court." *Garcia*, 569

F.3d at 1181.

An example of BCT's pattern of behavior and the way it has interfered with the judicial

process is its response to Philips' first motion for spoliation, which was filed on December 21,

2009.  BCT responded and strenuously argued at the January 6, 2010 hearing that it needed an

evidentiary hearing, that it would show that all the data was otherwise available and recoverable,

and that it would interview all the employees.   This response was stated in declarations and on

the record.  (Doc. 141, ¶ 20.)  BCT demanded an evidentiary hearing to prove its position and

asked for extended time to file responsive pleadings and declarations.  Despite being given the

requested additional time to prove its position, BCT and its counsel did not even interview all the

witnesses because Albuquerque testified he had not been contacted by a lawyer about the

spoliation until the day before the Hearing in February 2010.  Declarations were submitted by the

employees, which proved to be full of falsehoods and which on their face were contrary to the

findings of BCT's own computer forensic expert, who confirmed everything found by Philips'

expert.  Following those sworn - and false - declarations, BCT filed a motion to withdraw its

request for the evidentiary hearing.  Had that been allowed, BCT would have avoided its

spoliators being put on the witness stand and the record would have been decided on BCT's

faulty and knowingly-false declarations.  BCT's attempt to withdraw the evidentiary hearing and

leave the court with false declarations appears to be an attempt to perpetrate a fraud on this court.

*See Garcia*, 569 F.3d at 1181.

Another example of how BCT has interfered with the judicial process is how BCT responded to Philips' second motion alleging spoliation of evidence and violation of the court's order. In responding to that motion, BCT submitted an incomplete declaration on behalf of Sokolowski, the spoliator at issue; however, BCT failed to fill in the blank on Sokolowski's sworn Declaration identifying what file folder he deleted. As a result, it seems very likely that Sokolowski did not prepare his Declaration and did not read it with care before he signed it. In its reply brief, Philips pointed out the omission in Sokolowski's Declaration to BCT, as well as pointing out that Norberg had identified numerous deleted folders (rather than simply one folder, as stated in the Declaration) from the BCT laptop used by Sokolowski. BCT never filed a supplemental declaration or errata sheet. BCT simply made no effort to correct the mistake in Sokolowski's Declaration.

BCT's behavior required Philips - and now the court - to expend an enormous amount of time examining documents, testimony, and arguments made by BCT in this case - many of which have proved to be false and unreliable. In addition to consuming court resources in this way, BCT's behavior is contrary to the behavior required of litigants and their attorneys in order to preserve the integrity of the justice system.

### iii. BCT'S Culpability

The court discussed BCT's culpability above, where the court found that BCT's destruction of evidence was done in bad faith. Here, BCT executives and employees purposefully deleted, then wiped, shredded, and overwrote files from their computer hard drives after learning of the court's order compelling BCT to produce its ESI and/or just before the

computers were turned in to be imaged by Lighthouse. After this behavior, several employees and executives - including BCT's Chief Technical Officer - lied about their behavior in their depositions, sworn declarations, and/or in the Hearing, in an apparent attempt to commit fraud on this court. Further, BCT's CETO (and Founder) and COO also lied under oath during the investigation into the missing ESI. BCT flouted this court's authority and willfully disregarded this court's orders to turn over its ESI and to stop wiping hard drives.

The court considers the following quote in examining BCT's conduct in this case:

> In this post Iran-gate era of widely publicized evidence destruction by document shredding, it is well to remind litigants that such conduct will not be tolerated in judicial proceedings. Destruction of evidence cannot be countenanced in a justice system whose goal is to find the truth through honest and orderly production of evidence under established discovery rules. I hold that nothing less than default judgment on the issue of liability will suffice to both punish this defendant and deter others similarly tempted.

*Computer Assocs. Int'l, Inc.*, 133 F.R.D. at 170.

### iv. Advance Warning

Although one of the *Ehrenhaus* factors is whether the court gave BCT advanced warning that default judgment may result from its destruction of evidence, an explicit warning of a dismissal sanction is not required before a court may impose severe or terminating sanctions. *See Garcia*, 569 F.3d at 1180; *Archibeque v. Atchison, Topeka and Santa Fe Ry. Co.*, 70 F.3d 1172, 1175 (10th Cir. 1995). In this case, this court stated in its Order Granting Plaintiff's Motion to Compel Defendant to Preserve Relevant Information (Doc. 99) that the destruction of information would likely lead to "sanctions or spoliation instructions." This statement does not

expressly state that default judgment may result in the destruction of evidence, but it does warn BCT that sanctions may result.

BCT is represented by sophisticated counsel. Case law - even that which the court relies on in this Report and Recommendation - provides that default judgment is a possible sanction; therefore, BCT's counsel should have been and likely was aware that default judgment may result from destruction of evidence. Because of BCT's resistance to meet Philips' discovery requests in this case, this court had already compelled BCT to preserve evidence. A default judgment cannot come as a complete surprise to BCT.

### v. Efficacy of Lesser Sanctions

The court has set forth BCT's bad behavior at length above. The court must now determine whether sanctions less than those requested by Philips would be effective in this case.

There is no way to know exactly what evidence BCT destroyed; therefore, there is no way to know how to place Philips back into a position where it would not suffer significant prejudice as a result of BCT's destruction of evidence. The court cannot rely on the testimony given by BCT's witnesses (except Albuquerque - and even his testimony contains some contradictions) because the court finds them to lack credibility. The names of files and other evidence Norberg was able to unearth strongly suggests the relevance and importance some of the deleted documents had to Philips' claims.

Further, spoliation sanctions serve a dual function. Not only are they meant to penalize litigants, but they also serve to deter those who might be tempted to cause the spoliation of evidence. Lesser sanctions would not establish deterrence some litigants need regarding this

behavior, especially as it relates to ESI. "One who anticipates that compliance with discovery rules, and the resulting production of damning evidence, will produce an adverse judgment will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he . . . is tempted to thus evade." *Computer Assocs. Int'l Inc.*, 122 F.R.D. at 170. In other words, courts have recognized that if parties are willing to take the risk and balance destroying evidence against turning over the proverbial smoking gun, knowing that the destruction will not result in the ultimate judgment, destruction of important evidence will occur. The court must not inherently reward the misbehavior of companies and individuals who want to destroy incriminating evidence rather than produce it and have a judgment entered against them; litigants must be strongly discouraged, rather than encouraged in any way, to become more and more clever about how to delete and hide the destruction of electronic documents.

In addition, the court must maintain order and punish those who violate its direct orders. If parties could "'ignore court orders . . . without suffering the consequences, then the district court cannot administer orderly justice, and the result would be chaos.'" *Ehrenhaous*, 965 F.2d at 921 (citation omitted). It is extremely important that courts maintain faith in the integrity of the judicial system. Further, courts must be able to rely on litigants and their counsel to follow court orders.

Where spoliation is intentional or committed in bad faith, the court may enter default judgment in favor of (and dismiss claims against) the innocent party. *See Philips M. Adams*, 621 F. Supp. 2d at 1192; *Computer Assocs. Int'l, Inc.,* 133 F.R.D. at 169-70. The facts of this case and case law supports such a sanction in this case.

110

In *In re Krause*, an adversary proceeding in bankruptcy, the court addressed spoliation similiar to that of BCT's here, in which a debtor used a commercial wiping program ("GhostSurf") to delete electronic files the day before he turned his hard drives over to a bankruptcy trustee, and shortly after the court had ordered him to produce the information. The court found that the debtor's "deliberate and intentional use of a wiping software program such as GhostSurf and the timing of its use . . . leads the Court to the inescapable conclusion that [the debtor] willfully and intentionally destroyed electronically stored evidence." *In re Krause*, 367 B.R. 740, 767 (Bkrtcy. D. Kan. 2007). The court further recognized that the Trustee had been "severely prejudiced" because, while a sampling of some of the salvaged "orphan" and temporary internet files indicated the documents were likely relevant to the proceedings, the debtor's spoliation meant that "no one will ever know what was on those computers before they were wiped and purged with GhostSurf." *In re Krause*, 367 B.R. at 769. The court stated, "[The debtor's] running of the GhostSurf wiping program after being ordered to produce electronic evidence and before turnover of his computers is simply inexcusable." *Id.* at 770-71. The court concluded that the debtor's actions warranted "the severest of sanctions," and entered partial default judgment and a myriad of other sanctions against the debtor. *In re Krause*, 367 B.R. at 772.

The same analysis should be applied here. Like the debtor's actions in *Krause*, BCT's use of AbsoluteShield and Cipher to eliminate evidence after being ordered to produce it is inexcusable. Gasparovich also overwrote evidence of the files he destroyed with massive amounts of video, audio, and picture files. Lesser sanctions would not sufficiently punish BCT,

cure the prejudice suffered by Philips, or deter other litigants tempted to engage in such bad faith spoliation. *See Arista Records, LLC*, 633 F. Supp. 2d at 138-39 (explaining that lesser sanctions "have been found to be ill-suited to cases involving bad faith irretrievable spoliation of likely important documents"); *Computer Assocs. Int'l Inc.*, 133 F.R.D. at 169; *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 960-61 (9th Cir. 2006) (affirming terminating sanction under similar facts where hard drive was intentionally wiped and over 2,200 files were deleted).

Another example that guides this court's decision is *Wm T. Thompson Co. v. Gen. Nutrition Corp., Inc.*, 593 F. Supp. 1443 (C.D. Cal. 1984), a Lanham Act claim involving false advertising and similar claims. In striking similarity to the instant case, which also involves a Lanham Act claim, the defendant GNC failed to issue a litigation hold, failed to implement procedures to preserve documents, and failed to provide employees with instructions to save documents. The court also pointed out that GNC and its counsel's conduct of discovery was intended to, and did unfairly, expand the proceedings, and that GNC sought to and succeeded in frustrating and obstructing discovery, either in derogation or in disregard of the court's authority. Finally, the court stated: "GNC has engaged in a pattern of order violations and discovery abuse, including defiance and indifference to the orders of the court, to their obligations and duties as litigants and to the discovery process under the Federal Rules of Civil Procedure." 593 F. Supp. at 1454. The court carefully considered less severe sanctions, but ultimately ordered a default judgment. The court concluded that because the evidence went directly to the Lanham Act violations, entry of an evidence preclusion order would virtually compel a directed verdict and unequivocally establish the truth of the bait and switch advertising claims. Accordingly, entry of

112

default judgment was appropriate, both for discovery violations and because it was an appropriate sanction given the conduct.  As the court stated:

> Imposition of severe sanctions is required in this case by the severity of the abuses that took place.  The record shows that GNC deliberately and purposely undertook a program to impede and obstruct the litigation process, presumably because it believed the case would be lost if all the evidence ever came to light.  Imposition of a lesser sanction would only reward GNC for its misconduct in this litigation.

593 F. Supp. at 1456.  As a result, the court ordered default judgment and a default judgment hearing for the court to determine the amount of judgment.  The court also ordered monetary sanctions to compensate the plaintiff for the discovery abuses and spoliation.

The *Krumwiede* case involved trade secrets under the Illinois Trade Secret Act.  *See Krumwiede v. Brighton Assocs.*, __ F. Supp. 2d __, 2006 WL 1308629 (N.D. Ill. 2006).  Like this case, the destroyed evidence could have established the trade secrets.  Like here, there was a conscious and deliberate attempt to destroy and cover up the conduct.  As the *Krumweide* court stated:

> Furthermore, at least 111 files were deliberately deleted and overwritten and are no longer recoverable.  It follows that, as a result of Krumweide's actions, Brighton may no longer rely on evidence essential to its underlying claims and Brighton has been prejudiced by Krumweide's spoliation of evidence.

*Krumweide*, 2006 WL 1308629, at *10.  Default judgment was entered along with an award of costs and fees.

This court could impose lesser sanctions in this case.  BCT requests that the court - as the court did in the *Phillip M. Adams* case, allow BCT another chance to find replacement copies of

113

the documents that were permanently destroyed in this case for which replacement copies have

not yet been produced to Philips.  *See Phillip M. Adams*, 621 F. Supp. 2d at 1195; Tr2. at 60.

Having carefully considered this option, the court concludes that because of the types of claims

involved in this action and the circumstances of the case, this case is distinguishable from *Phillip*

*M. Adams*.  In that case, this court concluded:

> Prejudice by loss of evidence must be measured in light of "other
> evidence available."  These motions were briefed months ago.
> Even now, fact discovery related to Adams' claims is still open.  It
> is scheduled to close May 15, 2009.  Therefore, the degree of
> prejudice and the appropriate sanction cannot be determined until
> the close of discovery.  Adams and ASUS will be directed to
> provide further briefing to enable determination of prejudice and
> the appropriate sanction.

621 F. Supp. 2d at 1195 (citations omitted).  In *Phillip M. Adams,* the parties were still fairly

early in litigation; in this case, the parties have been litigating for over two years.[40]  In this case,

BCT has admitted that thousands of documents were deliberately destroyed, in violation of two

court orders, and many of those documents are permanently destroyed.  BCT had several months

after Philips brought to light the deletions that were made to find duplicates of the permanently

destroyed documents.[41]  BCT has provided Philips with many replacements of the destroyed

---

[40]In fact, this case is so far advanced that the parties had prepared for a trial date that was
bumped by the court due to court scheduling issues.

[41]BCT argues that duplicates of some, and perhaps all, of the missing documents may be
on its backup drives.  BCT seeks additional time to cross-reference those backup drives with the
information gleaned by the forensic experts from the five BCT laptops.  Philips responds that
BCT's behavior has illustrated that the information BCT argues would be revealed by such an
activity does not exist.  Philips points out that at the January 6, 2010 hearing, when BCT's reply
memorandum was due but BCT had not yet prepared such a document, BCT represented to the

electronic documents, but it is undisputed that many documents have not been replaced. It appears that those documents are simply gone forever. Ongoing discovery will not change that fact. Further, this case and *Phillip M. Adams* are very different cases in their claims, background, and facts. One of the claims in this case involves the Lanham Act, a trade secret claim, and copyright infringement claims, among others. These claims distinguish it from other kinds of cases. For example, for each violation of a trade secret that is shown, Philips has a trade secret claim. *See* Tr2. at 70. For each violation of a copyright infringement, Philips has a claim. *See id.* Thus, with certain claims, each violation shown goes to the scope of both Philips' damages and BCT's liability. *See id.* In addition, as has been extensively discussed herein, BCT's conduct in dealing with the motions before the court has been heavily peppered with dishonesty, fraud on the court, and indifference or contempt of these proceedings.[42] The court's decision in *Phillip M. Adams* does not fit this case's circumstances and claims.

The court also has considered such options as only monetary sanctions, an adverse jury instruction, and default judgment on only one or two Philips claims; however, the court has concluded that these lesser sanctions would do too little to place Philips back in the position it

---

court that it needed more time to send the drivers and disks to Hooper to verify Norberg's work and *to cross-reference what was taken off the drives from the laptops against the large backup drives (which had been furnished to Philips as part of discovery) to see if the material deleted from the individual laptops was given to Philips in another form.* Philips argues that because BCT still has not produced that information - that metadata - that it does not exist. *See* Tr2. at 65.

[42]By way of information, at the oral arguments hearing on April 13, 2010, Philips' counsel presented the court with two BCT documents that would have been responsive to Philips' discovery requests, but which BCT never provided to Philips. *See* Tr2. at 73-5.

would have been had the massive number of deletions not occurred, and they would essentially reward BCT for its inexcusable behavior in this case. Thus, the court has concluded that the sanctions requested by Philips - although very extreme - are the appropriate ones in this case.

Civil litigation and discovery demand a level of integrity from the parties in order to properly function. When parties disregard that responsibility and/or ignore the court's mandates, there must be strong consequences. Having examined the degree of prejudice to Philips, the interference with the judicial process, BCT's culpability, whether BCT was warned in advance that its non-compliance may result in dismissal, and the efficacy of lesser sanctions, the court concludes that extreme sanctions are warranted in this case where discovery abuses of a serious magnitude involving bad faith and willful disregard of two direct court orders occurred. *See Ehrenhaus*, 965 F.2d at 920; *accord Garcia*, 569 F.3d at 1179; *Archibeque*, 70 F.3d at 1174-75. In considering the facts of this case, the court concludes that sanctions less than those requested by Philips - including default judgment - would not effectively either deter others from such behavior in other cases or make Philips whole from the permanent destruction of so many documents. As a result, the court recommends that BCT's amended answer be stricken, that BCT's counterclaims be dismissed, and that judgment by default be entered in Philips' favor. The court also has concluded that monetary sanctions are appropriate in this case, and will file a separate order addressing those sanctions.

## FINDINGS

In addition to the findings made above, based on the court's analysis and observations during the Hearing, the court finds that Dan Gasparovich, Jerry Williams, Marcus Carter, and Charles Hale lied under oath before this court at the evidentiary hearing held on February 10 and 11, 2010.

## RECOMMENDATION

Based on the above analysis, **IT IS RECOMMENDED** that the court strike BCT's answer, dismiss BCT's counterclaims, and enter default judgment as to liability in Philips' favor.

In addition, in light of the above findings, the court recommends that this matter be referred to the United States Attorney's Office for investigation and criminal prosecution.

Copies of this Report and Recommendation are being sent to all parties, who are hereby notified of their right to object.  The parties must file any objection to this Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1),  within fourteen (14) days after receiving it.  Failure to file objections may constitute a waiver of those objections upon subsequent appellate review.

DATED this 27th day of July, 2010.

BY THE COURT:

_____
SAMUEL ALBA
United States Magistrate Judge